UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMIA DIVISION

CASE NO. 11-22230-CV-COOKE/TURNOFF

JANE DOE, Plaintiff,

Vs.

NCL (BAHAMAS) LTD., Defendant.

_____/

DECLARATION OF MARK A. WILLINGHAM

1. I, Mark A. Willingham, declare as follows:

2. I have sufficient education, training, and experience to comment on the subjects in this report and to render these opinions. My education, training, and experience is outlined in, but not limited to, my Curriculum Vita, which is attached to and made a part of this report.

3. I have reviewed the following documents provided to me in the above styled case:

   a. Brevard Sheriff's Office Investigative Report.
   b. Defendant's responses to Plaintiff's first request for admissions dated December 19, 2011.
   c. Defendant's notice of serving responses to Plaintiff's first set of interrogatories dated December 19 2011.
   d. Plaintiff's notice of serving verified answers to Defendant's first set of interrogatories.
   e. Deposition of Aubrey Laughrey.
   f. Exhibits to Christopher and Aubrey Laughrey Deposition.
   g. Deposition of Jane Doe.
   h. Deposition of Rebecca Ann Walker Spencer.
   i. Exhibits to Ronald Spenser Deposition.
   j. Deposition of Ronald Spencer.
   k. Deposition of Sheryl Spencer.
   l. Exhibits to William Spenser Deposition.
   m. Deposition of William Richard Spencer.
   n. Omnibus Order.
   o. Exhibits to Mark Kansley Deposition.
   p. Deposition of Mark Kansley.
   q. Defendant's Amended Responses To Plaintiff's First Request for Production Dated December 19, 2011.

1

r. Defendant's notice of serving amended responses to Plaintiff's first set of interrogatories dated December 19, 2011.
s. Defendants amended responses to Plaintiff's first request for admissions dated December 19, 2011.
t. Exhibits to Jane Doe deposition.
u. Defendant's supplemental amended response to Plaintiff's first request for production number one dated December 19, 2011.
v. Exhibits to Jane Kilgour deposition.
w. Complaint and jury demand.
x. Defendant's responses to Plaintiff's second request for production dated May 21 2012.
y. Defendant's second amended responses to Plaintiff's first request for admissions dated December 19 2011.
z. Defendant's second amended responses to Plaintiff's request for production – response number one – pictures only.
aa. Defendant's second amended response to Plaintiff's RFP – response number three.
bb. Defendant's answer and affirmative defenses to Plaintiffs' complaint.
cc. Deposition of Jane Doe, continued.
dd. Deposition of Jane Kilgour.
ee. DVD Video - 8 Clips.
ff. Report from Dr. Joel M. Milzoff.

**4. It is my expert opinion** that Norwegian Cruise Lines (NCL) owed a duty of care to Ms. Jane Doe to serve alcoholic beverages to her in a non-negligent manner reasonable under the circumstances while a passenger on the Norwegian Sun on April 11, 2011. NCL owed Ms. Jane Doe a duty to exercise reasonable care under the circumstances to care for an intoxicated passenger. NCL's duty of care required it to establish reasonable and appropriate alcohol service policies and procedures, employee training, management and management systems, and risk assessment and abatement practices; and to provide for the reasonable care and safety of any patron who may become intoxicated. NCL failed to honor these duties.

**5. Background Information.** NCL's Security Officer Fail advised the Brevard County Sheriff's Office that a passenger, Ms. Jane Doe, participated in a "pub crawl" (an event which involves visiting and drinking at several bars) on April 11, 2011, which began at approximately 1300 hrs. Ms. Doe became highly intoxicated during the pub crawl. She went to the restroom located in the Garden Café on deck 11 sometime after 1610 hrs. According to officer Fail, Ms. Doe advised she was in one of the stalls when she heard someone enter the restroom. A male stated her name, "Susan." Ms. Doe did not recognize the voice, the responded to whoever it was. The male open the stall at this time, turned her around, and "had his way with her." She stated that she was too intoxicated to identify him or fight him off.

**6. Ms. Jane Doe was not a regular drinker.** Jane Doe (deposition page 98) stated that she drinks rarely, maybe a couple of drinks every two or three months. She stated she may go six months without having anything at all. William Spencer (deposition page 25) stated that Jane Doe apologized the next day for her intoxication stating she did not realize how strong the drinks were. Based on this drinking pattern, it is unlikely that Doe was habitually addicted to alcohol or had developed a high tolerance to the effects of alcohol.

**7. Ms. Jane Doe became highly intoxicated** on April 11, 2011 on board the Norwegian Cruise Line Sun. Ample evidence exists of Ms. Jane Doe's intoxication on the NCL ship on April 11, 2011. In her written statement (Investigative report 28), Rebecca Spencer stated Doe had not eaten very much before the pub crawl and was highly intoxicated. As referenced in the Brevard County Sheriff's Office Investigative Report, Pat Laughrey stated in a recorded statement that, " Susan was very drunk" at the Great Outdoor bar after the pub crawl. In Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, the Plaintiff states, "Upon sitting to relieve myself, I felt very impaired and rested my head on the tissue holder." In Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, the Plaintiff stated, "Someone asked me if I could walk, and I replied that I could not." Jane Doe, in her deposition (page 114), stated when I got to the bathroom my recollection is that I went to the farthest stall." "When I sat down, I started truly feeling the effects of having drunk. The room spun. I felt very sick. I actually threw up." Jane Doe (deposition page 181) stated , "I was incapacitated and unable to even stand on my own feet once I was in the restroom and I was wheeled to my cabin." Rebecca Spencer (in her deposition page 46) stated, "I asked her (Jane Doe) if she was okay and she said, 'no.' She was drunk." NCL Staff member Watters identified Doe as a "drunk girl" when reporting that Doe had been escorted to her cabin. NCL staff member Quintana also identified Doe as the "drunk lady" in her written NCL statement.

The behaviors described by Jane Doe and others who observed her are behaviors associated with extreme intoxication. These behaviors would not manifest themselves in a matter of minutes and would have been evident and observable to a properly trained, managed, and motivated employee well prior to Ms. Doe going to the restroom just prior to the sexual assault.

Dr. Milzoff, in his report, finds that Ms. Doe had a BAC of between 0.09 – 0.15 g % upon consumption of the alcohol she and others reported that Doe consumed. Dr. Milzoff stated that individuals having a blood concentration equal to or greater than 0.10 g% appear visually intoxicated.

**8. More likely than not, Ms. Jane Doe's intoxication level left her vulnerable to the sexual assault and unable to protect herself.** Rebecca Spencer (in her deposition page 46) stated, "I asked her (Jane Doe) if she was okay and she said no. She was drunk." In the Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, Doe stated she was sexually assaulted and "was incapable of protecting myself." Jane Doe (deposition page 124) was asked at any point in time did you attempt to resist the attack and she said, "I didn't have my faculties about me. I had no ability to do that." Security Officer Joe Fail wrote in his report dated April 13, 2011,"Doe stated that she was too intoxicated to identify him or fight him off."

**9. Ms. Jane Doe's intoxication occurred over the time she participated in the pub crawl and during her visit to the Great Outdoor bar and should have been evident to a properly trained, motivated, and managed bartender, bartender manager, security officer, and/or ship's officer.** The behaviors attributed to Doe by herself and by witnesses are such that a non-negligent employee should have been able to observe and which should have formed the basis for a decision to discontinue alcohol service and to take steps to care for Doe, who was intoxicated and in need of care. This duty is especially relevant considering that most, if not all of the people with whom Doe was affiliated during the pub crawl and at the Great Outdoor bar had also been consuming alcoholic beverages which may have affected their ability to assess Doe's intoxication level.

Ms. Jane Doe was overly friendly to other guests and employees and exhibited increased sociability and talkativeness which was an indication of intoxication. Ronald Spencer (deposition page 36) was asked do you think Susan's behavior at the fantail after the pub crawl was inappropriate in any way and he stated, "a little. In some things. Well, I mean by inappropriate, just drunk." Aubrey Laughrey (deposition page 30) was asked during the course of the pub crawl, and then after the pub crawl out on the back fantail at the bar, how would you describe Ms. Doe's behavior. She said, "she was very friendly, outgoing. She was a little flirty. She was just outgoing." She was asked who was Doe flirty toward and she said all of the guys, pretty much. Aubrey Laughrey 70 was asked would you characterize the body shots as being flirtations on her part and she said yes. Aubrey Laughrey 30 was asked during the course of the pub crawl, and then after the pub crawl out on the back fantail at the bar, how would you describe Ms. Doe's behavior. She said she was very friendly, outgoing. She was a little flirty. She was just outgoing. She was asked who was Doe flirty toward and she said all of the guys, pretty much.

Ms. Jane Doe exhibited a loss of judgment in ordering additional alcoholic beverages which was an indication of intoxication after consuming 6 drinks during the pub crawl. Jane Doe 105 was asked after you drank your first margarita, how did you feel to which he stated I like to say I was feeling fine. I was feeling somewhat intoxicated, I'm sure, but I wasn't feeling any pain. In spite of that, she continued to order additional alcoholic beverages. Jane Doe 103 stated that she probably ordered her first margarita 20 to 30 minutes after the body shot. She was feeling okay. She stated she was probably feeling what people refer to as a high. She acknowledged that she was in control of her faculties.

Ms. Jane Doe exhibited disinhibition which was a sign of intoxication. Aubrey Laughrey 31 was asked what his Susan appeared to be doing in the photograph marked as Exhibit 11 and she said making the kiss he face, got puckered lips. Jane Doe 97 was asked at any point in time did you drink from between someone's legs and she said yes, I did. I did a body shot with a gentleman who was on her team after the conclusion -- or with our final drink, the shot. She stated she did this at the pub crawl.

Jane Doe 98 stated, "I placed my shot between my breasts and he drank it. And then he placed his shot between his legs and I drink it." She said she did not know his name. She stated, "I believe it was a shot of tequila. It was served in a Patron tall shot glass. I only noticed that because I like Patron if I'm going to drink."

Jane Doe 101 was asked before you did the final body shot were you feeling the effects of the alcohol you consume to the pub crawl and she stated I think I probably was, otherwise, I don't think I would've done the body shot. Jane Doe stated I would say that I was probably feeling a little loose, if that's an appropriate word. Jane Doe was asked how about after you did the body shot, how are you feeling and she stated I was feeling it a little bit, yes. I was probably feeling a little more lightheaded maybe. That's all I can think of at the moment. I don't know what else.

Jane Doe 184 was asked does alcohol disinhibited you to which he said if I drink too much, yes, it does. Jane Doe 184 was asked were you feeling disinhibited after the pub crawl and she said, "I don't recall that I was other than – at least a little extent where I would not have been able to do the body shots."

Jane Doe 184 was asked does alcohol disinhibited you to which he said if I drink too much, yes, it does. Jane Doe 184 was asked were you feeling disinhibited after the pub crawl and she said I don't recall that I was other than – at least a little extent where I would not have been able to do the body shots.

Aubrey Laughrey 31 was asked what his Susan appeared to be doing in the photograph marked as Exhibit 11 and she said making the kiss he face, got puckered lips. Aubrey Laughrey 70 was asked would you characterize the body shots as being flirtations on her part and she said yes. Aubrey Laughrey 94 was asked about the comment she started to say about Ms. Doe being physical. She was asked what she meant and she stated just at the very least, arms around someone, making Kissee face it someone. Kind of touchy with someone you didn't know. We didn't freak out. I mean, I wasn't mad, but I was just kind of like, okay, she is friendly.

**10. More likely than not, the alcohol served to Ms. Jane Doe during the pub crawl and at the Great Outdoor bar afterwards resulted in her intoxication, was negligent, and not reasonable under the circumstances.** NCL had an obligation to serve alcoholic beverages to Ms. Jane Doe in a safe manner and in a manner consistent with their policies, consistent with reasonable standards of care, and consistent with the ServSafe training program. The service of sufficient alcoholic beverages to Doe to cause the level of intoxication Doe and others reported is negligent, not reasonable under the circumstances, and was a causation factor in her subsequent harm.

In Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, Plaintiff states, "I participated in a pub crawl aboard the Norwegian Sun that began around 1:15 PM on Monday, April 11, 2011, and was scheduled to conclude in about an hour. According to the Defendant's Notice of Serving Responses to Plaintiff's First Set of Interrogatories dated December 19, 2011, Defendant states, "The pub crawls estimated duration is 90 min. On the subject pub crawl, the guests visited the following bars and were served the following drinks: Champs Bar – Rum Swizzle, Observation Lounge – Mighty Berry, Top Sider's Bar – Green Goddess, Sports Bar/Las Ramblas – Blue Kamikaze, and Great Outdoors – Jolly Rancher. Corporate Representative Mark Kansley 80 was asked and acknowledged that a person who participates in a pub crawl and has five drinks, a drink at each of the five various pub crawl stops, and hypothetically a person is on a winning team of the pub crawl, that they are given a prize at the sixth bar which is an alcoholic shot.

However, Doe was served far more than the alcohol than that served to her during the pub crawl. In Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, Plaintiff states, "I participated in a ship sponsored pub crawl. I consume five cocktails (one at each pub crawl stop), a shot of tequila (awarded to my pub crawl team), and two additional margaritas after the conclusion of the pub crawl. Jane Doe 165 acknowledged that she sipped her margarita. She was asked how long does it between the first margarita and the second margarita and she said I would say 45 min., maybe an hour. She was asked and acknowledged that she only drank about half of the second margarita. The amount of alcohol consumed by Doe, more likely than not, was between 7 and 10 standard drink units (SDUs).

It is clear that the alcohol service and consumption resulted in Doe's subsequent intoxication. Corporate Representative Mark Kansley 122 was asked and stated he did not have any knowledge that the plaintiff drank other people's drinks during the pub crawl. Corporate Representative Mark Kansley 116 was asked so let's exclude the possibility that you consumed alcohol on shore or that you were given alcohol by another passenger, and he stated then it makes – stands to reason, yes.

Had NCL utilized drink counting, more likely than not they would have recognized Jane Doe's intoxication level which would have presented the opportunity to discontinue alcohol service and to have provided appropriate care to Jane Doe. Had NCL's employees acted reasonably in assessing Doe's

5

behavior for intoxication through the observation of flushing of her face, redness in her eyes, glassy eyes, and strong odor of alcohol about her person, among other factors, which more likely than not would have been evident at her BAC level, in addition to the behaviors mentioned by Corporate Representative Mark Kangly consisting of gross motor dysfunction, NCL employees would have been presented with the opportunity to discontinue alcohol service and to provide appropriate care to Jane Doe.

**11. The drinks served during the pub crawl may have reasonably contained more alcohol that NCL admits and as such, was not reasonable under the circumstances.** Jane Doe 184 was asked about the drinks during the pub crawl and she said that they were pretty cheap alcohol. She was asked would you say that they were especially strong, not especially strong middle of the road or something else to which she stated, "for someone who drinks as infrequently as I do, I wouldn't say very strong but they were pretty strong." William Spencer 38 was asked with a watered-down and he said no, "I don't think they were watered down." He was asked did they take strong to you and he said, "yes. I could taste the alcohol." Additionally, several deponents testified that they became intoxicated or "were buzzed" after consuming the drinks during the pub crawl.

**12. NCL staff knew or should have known the amount of alcohol served to and consumed by Doe.** Corporate Representative Mark Kansley 132 was asked would the bartender at the sixth location know that these are pub crawl participants who were walking out with the NCL leader because they had the little stickies on them that show that they are a pub crawl participant to which he said, " if the head bartender instructed this bartender to give these group of people the sixth drink because they were part of the pub crawl, the winner of the pub crawl, he would know from that that they were part of the pub crawl, yes." NCL's bartenders were on notice of the 6th, 7th, and part of the 8th drink. The pub crawl was a well-known and well established process. Each bartender knew or reasonably should have known what Doe had to drink and over how much time. Corporate Representative Mark Kansley 132 stated that the bartender would know that they (the pub crawl participants) had already had five drinks. Corporate Representative Mark Kansley 132 was asked would the bartender know that he is serving a sixth drink complementary on behalf of NCL to which he said, "he knows that. He was instructed to do that." Corporate Representative Mark Kansley 133 was asked well, not a lot of people go on the pub crawl not to have the drinks, do they? Does the bartender have any information to that effect and he said, "No." Corporate Representative Mark Kansley 134 was asked and acknowledged it would be safe for the bartender to assume that the winning team had just finished drinking five drinks. He acknowledged that it would be safe for the bartender to assume that the complementary shot constituted a six drink. He acknowledged that it would be safe for the bartender to assume that erring on the side of being safe, that if a person ordered another drink that would constitute a seventh drink in perhaps just over an hour. Clearly, NCL staff were on notice of the excessive amount of alcohol served to and consumed by Jane Doe prior to the sexual assault on April 11, 2011.

**13. More likely than not, an inducement to consume alcoholic beverages was created by NCL through the pub crawl which was not reasonable under the circumstances.** The pub crawl advertisement was reasonably indented to induce alcohol consumption. The Freestyle newsletter dated April 11, 2011 (Jane Doe exhibits: page 1), reflects: Pub crawl!! Five drinks in the five bars in 55 min., can you handle? Join your fellow crawler and make lifelong friends. It's only $25 and the cheapest bit of alcohol you will get all cruise long! Time 1:15 p.m. Champs Bar, Deck 12, Fwd. Don't miss this!

The pub crawl activities and development of participant enthusiasm were reasonably intended to lead to alcohol consumption. Plaintiff's Notice of Serving Verified Answers to Defendants First Set of Interrogatories states, "at each pub stop, the pub crawl leader (an NCL crewmember) would lead the participants in a toast, and then present an activity (competition, if you will) in which one or two participants from each team took part. He announced that the team winning the most competitions when an extra drink at the end of the pub crawl."

Jane Doe 95 stated after that, the third part, we have a little competition would each team had to do a cheerleading thing. I think it was after that we went to another bar. And I can't remember the name of it, but they had a competition where they had a male member sit on a barstool. They placed a beer bottle between his legs, and his crotch, and put a straw in the beer bottle and the girl would drink a beer. And who ever drank it the fastest won the competition.

Jane Doe 97 was asked at any point in time did you drink from between someone's legs and she said yes, I did. I did a body shop with a gentleman who was on her team after the conclusion – or with our final drink, the shot. She stated she did this at the pub crawl. Aubrey Laughrey 27 acknowledged that the photograph depicts drinking from between the man's legs and the drinking from between Ms. Doe's breasts that was being done at the last pub crawl bar in the back.

The behavior at NCL's pub crawl is different from other pub crawls and contributed to inducements to drink. Aubrey Laughrey 59 was asked was the practice of a person drinking from between the other person's legs or breasts the kind of things that you've seen at other pub crawls that you been to and she said no. Aubrey Laughrey 60 was asked and on those previous four pub crawls, you had not seen this activity where a person, perhaps a male drinks from between a woman's breasts, or woman drinks from between a man's legs and she said, "No. At the pub crawls I've been to, there are no activities like they do on the ship. They weren't fostered activities. You just get a drink." William Spencer 42 was asked about the games. He said, "One of them was a singing game. You had to sing a song. One of them was – the group one we did is we had to come up with a cheer. One of them was you choose a male and a female and they put the beer down between the males legs and the female had to kneel down and drink the beer, the beer bottle between his legs. I know I didn't participate in any of the canes except for the group one. And right now I can't remember too much about what the other ones were. I know there was a singing one, somebody had to saying. They had the group cheer. They had the beer drinking." William Spencer 78 was asked when you did the pub crawl, did you have to toast before you took the drink and he said, "I think so. I believe we did. This may be at the end because, as I remember, all the different stops had plastic cups and this is Scott glass cups, glass. So this may have been our group drink at the end. And I think maybe they were toasting us as the winning team. I think that's what it was." Ronald Spencer 58 was asked did the NCL leader as part of his games and activities, encourage the consumption of alcohol to which he said, "yes. There was a couple of drinking games."

NCL created an inducement to drink by bartender action which was not reasonable under the circumstance. William Spencer 44 was asked did you drink all of the drinks on the pub crawl to which he stated, "There may have been one I didn't. I remember one time we were going to the second, possibly the second one, and Susan tried to put the drink down and the bartender goes, no wasty wasty, drinky drinky, and kind of coerced her into finishing the drink. So they didn't like you not drinking the drinks. There may have been one which I didn't really care for and I put down, but for the most part I did, yes, drink the

drinks." In the Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, the Plaintiff stated, "I found the 'Rough Rider' cocktails served at the second pub quite distasteful. Upon reaching the third pub, I placed the Rough Rider drink provided by the bartender at the second bar on the bar to exchange it for the drink offered at the third pub. The bartender handed the drink back to me and said "no wastee, no wastee. Bill Spencer heard the bartender tell me this. I reluctantly consumed the Rough Rider, and the bartender then gave me the cocktail allotted from the third pub crawl site." Jane Doe 94 stated, "When we reached the third pub, typically, we would discard our cups or leave our cups on the bar and then they would give us a new drink. But I did not like to drink that was served at the second bar and I tried to give it back to the bartender. And he told me, "no wasty, no wasty," and gave me back my drink. And once I consume that, he gave me the next one." William Spencer 45 was asked what did Doe do after she was told not to waste the drink and he stated, "She finished the drink."

Corporate Representative Mark Kansley 104 was asked would it have been appropriate for any bar server or beverage staff member during the pub crawl to encourage a pub crawl participant to finish the drink whether that person liked it or not. Corporate Representative Mark Kansley 104 stated, "I think the people conducting the pub crawl would try to make it fun for the guests by mainly *cajoling them* and *coaxing them* to consume the beverage in an entertaining way or in a fun fashion." (Italics added).

NCL created an inducement through drink service and patron intoxication which was not reasonable under the circumstances. In the Plaintiff's Notice of Serving Verified Answers to Defendant's First Set of Interrogatories, the Plaintiff stated, "My team won the most competitions, and we were given a shot of tequila as our sixth drink at the final stop of the pub crawl." Corporate Representative Jane Kilgour 30 was asked are you aware of any studies by NCL if a person drank the five drinks that were served during the pub crawl and then had a six drink – a shot of tequila at some point thereafter, that person would be impaired or considered impaired and she stated she was not aware of such a study.

**14. The pub crawl construct is inconsistent with responsible alcohol retailing.** The pub crawl was a one size fits all construct. Five drinks were served at 5 bars within 55 minutes without regard to gender, weight, body type. The only protection was the bartenders supposed ability and willingness to cut patrons off. Such a program presents a risk of over-service. Corporate Representative Mark Kansley 80 was asked and acknowledged that a person who participates in a pub crawl and has five drinks, a drink at each of the five various pub crawl stops, and hypothetically a person is on a winning team of the pub crawl, that they are given a prize at the sixth bar which is an alcoholic shot.

**15. NCL has not attempted to determine if the pub crawl, individually or in conjunction with other alcohol service, constituted a risk to NCL guests.** Corporate Representative Mark Kansley 134 acknowledged that there are no studies that you're aware of that say a person who finishes those first five drinks is going to be intoxicated or not intoxicated to which he said that's correct. Corporate Representative Mark Kansley 107 was asked so, because you have not conducted any studies with the drinks listed in answer to interrogatory number 21 and the alcohol content in 22, it may be that people who participate in this pub crawl of that, who complete the event in 55 or so minutes, can actually be impaired to which he said, "it's possible. But then again, if he got to the stage where they were impaired, visibly impaired, they would not be served. Their first or their fourth or fifth drink depending on at which stage they could possibly be impaired." The Corporate Representative acknowledged that the alcohol service done in the pub crawl could cause guest intoxication. Corporate Representative Jane Kilgour 29

8

was asked are you aware of any studies by NCL that completing a pub crawl as was orchestrated and advertised by NCL on the day in question whether that person would be legally sober and she said, "I have no idea." Jane Kilgour 30 was asked are you aware of any studies by NCL if a person drank the five drinks that were served during the pub crawl and then had a six drink – a shot of tequila at some point thereafter, that person would be impaired or considered impaired and she stated she was not aware of such a study. Corporate Representative Mark Kansley 106 was asked has NCL ever conducted many studies regarding the alcohol served during the pub crawl in April of 2011 looking to what degree a person would be impaired or perhaps not impaired after drinking the drinks listed in NCL's answer to interrogatory 21 assuming they drank all those drinks in that period of time which you say is about 90 min. Corporate Representative Mark Kansley 107 was asked have you done any studies whether that person would end up being impaired or not impaired and he said, "I'm not aware of them conducting any studies." This is particularly important considering the one-size-fits all approach to the pub crawl that NCL has taken.

Corporate Representative Jane Kilgour 31 was asked assuming that Jane Doe finished the five drinks that were served at the pub crawl and the drink that was provided to the winning team and drank a seventh drink which was a margarita, and half or so of an eight drink, is NCL taking the position that Jane Doe consumed excessive amounts of alcohol in this case and she stated, "I don't know." It is unreasonable for the Corporation not to know if Jane Doe, based on her weight, gender, and alcohol consumed over time was served to excess. In addition to not knowing if someone could become intoxicated at the pub crawl, NCL does not limit passengers from other alcohol excursions which puts them at significant risk of over-service.

**16. NCL exhibited a pattern and practice of alcohol over-service which violated a standard of care and was not reasonable under the circumstances.** NCL passengers report various levels of intoxication either after completion of the pub crawl or as a significant component of its cruise process.

William Spencer 34 was asked do you remember if there were any shipboard events that you participated in. He stated, "I think it was on Tuesday we did the pub crawl, and then, with my family members, most of my family members, went to the martini tasting, five martini tastings, and then after that we went to the bar at the front of the ship and had a two for one, I believe it was a martini." William Spencer 34 stated, " There were five different martinis." He was asked if they were full martinis and he said, "Yes." He said, "I think this was Tuesday and the cruise left on Sunday."

William Spencer 37 was asked how are you feeling after the pub crawl in he said, "After the pub crawl I was high; I was not incapacitated." He was asked and stated that he was buzzed. He stated that he was on the winning team and that's why he got the six drinks. He was asked what the sixth drink was and he stated, "I believe it was tequila. I think it was a shot of tequila."

William Spencer 37 was asked about his statement that on the day of the pub crawl, that evening you went and saw juggler or some kind of show like that and he was asked how are you feeling at the time and he said, "not too good. Because I had too much alcohol." William Spencer 37 was asked how many drinks did you have that day. He stated, "The pub crawl was six drinks, five martinis, and 2-for-1. So it was more than I should have had and more than I really wanted to, but." William Spencer 52 stated, "The martini tasting of them lasted 45 min. to maybe an hour." He was asked how he was feeling after that and he said, "I was more buzzed."

9

Sheryl Spencer 40 was asked is it your opinion that Ron, after the pub crawl and while he was in the fantail area had had too much to drink and she said, "Yes. If we had been on land, I would have been driving." Sheryl Spencer 40 was asked so with Ron in the condition that he was when you met him after the pub crawl bars, would you have allowed him to drive home and she said, "No."

Sheryl Spencer 48 was asked on land how many drinks does Ron have to have before you take his car keys away to which she stated, "I don't go by number of drinks, I go by behavior." She was asked what behavior she looks for and she stated, "Is he smiling, is he very verbal, is he very gregarious." These are behaviors that a properly trained, managed, and motivated bartender would be able to recognize.

Ronald Spencer 24 stated, "I think we went to five bars and had five drinks." Ronald Spencer 24 was asked how did you feel after the pub crawl, did you feel a little buzzed to which he stated, "a little buzzed, yes." Ronald Spencer 25 was asked and stated that he drank all of the drinks on the pub crawl. Ronald Spencer 26 stated, "In addition to the pub crawl, I went to the martini tasting." Ronald Spencer 27 stated that he went to the martini tasting after the pub crawl. He stated there was a little time in between.

Ronald Spencer 29 was asked how many drinks did you get at the martini tasting and he said, "5 or 6." He was asked if these were full martinis and he said, "Yes." He was asked how did you feel after the martini tasting and he said, "very good." He was asked were you able to go for dinner and he said, "Yes." Ronald Spencer 29 was asked if he went to the 2-for-1 drink of them as well and he said, "No." He said, "I think my brother did." He was asked and did you see Bill after the 2-for-1 and he said, "yes. He wasn't very talkative. He was pretty quiet. I think he was probably pretty well snockered."

Ronald Spencer 49 was asked after having the amount of alcohol that you had during the pub crawl and including that sixth location, do you think it would've been wise on your part to jump into a car and drive home and he said, "No." Ronald Spencer 50 was asked do you think it would've been prudent on your part after having the drinks you had at the five locations and the sixth, the fantail, as you call it, to jump in a car and drive home at that point and he said, "No." Ronald Spencer 50 was asked so when you referred to being happy, is that kind of a code word for intoxicated to a degree and he said, " Yes." Ronald Spencer 51 was asked if you were happy leaving the pub crawl plus the drink at the six location, the fantail location, how would you describe yourself after finishing five more martinis during the martini tasting contest to which he stated, "pretty snockered, pretty drunk." Ronald Spencer 52 was asked how would you describe yourself after having finished the five drinks at the martini tasting contest to which he stated, "I was pretty drunk."

Ronald Spencer 52 was asked so at this point, after having 6+5 drinks, you're talking about 11 drinks to which he said, "yes." He was asked where the evening's events at that point starting to get a little foggy and he said, "yes." He was asked so we're clear, your ability to recollect the evening's events was being impaired by the alcohol you've had to which he said, "yes."

Ronald Spencer 57 was asked and acknowledged that he had sailed on Norwegian Cruise lines on four trips. Ronald Spencer 57 was asked on any of the cruises with Norwegian Cruise lines had you ever had enough to drink where you would think to yourself I'm just glad I'm not driving home this would be a bad idea other than the one previously spoken about to which he said, "once or twice, yes."

Rebecca Spencer 41 was asked did you have any hesitation or question about Bill doing the pub crawl and then going to the martini tasting to which she stated, "I knew where he would be and I knew that I would make sure that he got to the room."

Aubrey Laughrey 75 was asked that you have a drink in every one of the pub crawl bars and she said, " Yes." Did you finish your drink at each of the pub bars and she said, "Yes." She acknowledged that that was at least five drinks. She was not part of the winning team. Aubrey Laughrey 29 was asked so your group, and Ms. Doe stated on the back of the ship at the fantail bar for some time after the pub crawl to which he said yes. She said they were just hanging out talking. We ordered a bucket of beer.

Aubrey Laughrey 34 stated that she and her husband had a bucket of beer. She stated that she thinks José and Tabitha were drinking from the bucket of beer. She was asked if she remembered what Ms. Doe was drinking and she said, "No. But I'm pretty sure everybody was drinking from the bucket because *we took turns buying one.*" Aubrey Laughrey 76 acknowledged that the gentleman with the microphone lead them in line to the fantail bar. She acknowledged that there were more drinks they are. She stated that was before they started the bucket of beer.

Aubrey Laughrey 78 acknowledged that she had five drinks during the pub crawl. She acknowledged that she and Tabitha had at least one mixed drink at the fantail. She acknowledged that on top of that there was the bucket of beer and she had at least one year, probably not much more. Aubrey Laughrey 79 was asked if she had a seventh alcoholic drink within, as best as you can recall, just over an hour to which he stated, "yes." Aubrey Laughrey 79 acknowledged that was five during the crawl which was about an hour. She stated, "I don't remember how long we stayed at the back, but another mixed drink, and probably another. I don't remember."

Aubrey Laughrey 80 was asked after having had the seventh drinks we just mentioned from the beginning of the pub crawl to the time that you're the fantail bar as you're saying, which we agreed has been seven, could you characterize if you felt as though you were impaired or intoxicated and she said, "Yes"

Mr. Christian Laughrey reported to Security Officer Joe Fail that he had been drinking a lot of alcohol.

**17. Based on the available examples of intoxication on the Sun, NCL was on notice of the potential for guest intoxication and the need to develop appropriate alcohol service policies and practice to protect patrons from harm. NCL fell below a reasonable standard of care in the development, implementation, distribution, and compliance monitoring of reasonable and effective alcohol service policies designed to prevent alcohol related harm which was not reasonable under the circumstances.**

Corporate Representative Mark Kansley 129 was asked assume for my purposes that after completion of the six bars and the drinks that were served to my client that she was impaired. In accordance with NCL's procedures, what duty was owed to her and he stated, "That would be dependent on the situation and how she was reacting. If she was visibly – if she was falling asleep, passed-out, we would act – take action accordingly." Kansley asked what *accordingly* means and he said, "if she was passing out, we would go to her and try to determine who she is traveling with, what cabin number she's from, try to get somebody to come up and take her or assist her to her cabin, asked her if she wanted assistance to her cabin." He stated, "If she was catatonic, we have a procedure where we call the safety manager and the medical

11

staff." Kinsley's explanation is unreasonable. These behaviors described by Kansley are well beyond any threshold for either intoxication or obviously intoxicated. It is unreasonable for NCL to only consider offering assistance to a patron who is passed-out or catatonic.

Corporate Representative Mark Kansley 130 was asked she is essentially passed out. We have covered a lesser category where she's perhaps not passed out but visibly impaired. If you have a female passenger who is not with her friends and she is visibly impaired, under that hypothetical situation what was this NCL's responsibility to her and he said, "the degree of visibly impaired will differ. There is no definite degrees of visibly impaired. We cannot say she was a little bit impaired or you're going to say she's a little bit impaired but more impaired or very much impaired. If the shipboard staff deemed that she was a danger to herself or to anybody else, they would have acted accordingly." Based on Corporate Representative Mark Kansley's statement, the aid offered to intoxicated passengers who are not passed out or catatonic is not addressed in policy and is only governed by the discretion of ship board staff. Allowing this degree of discretion in caring for an intoxicated passenger is irresponsible and negligent.

Corporate Representative Mark Kansley 100 was asked would you consider a comment by an NCL beverage staff member to a passenger that because they didn't have to drive home that night, obviously they're sailing on the ship, that it would be appropriate for them to over consume alcohol to which he said, "I would have to know what the comment is to know whether it's appropriate or not. He was told the comment was 'drink up, you don't have to drive home.'" He stated, "That would be appropriate if the person *was not totally impaired.*" By his answer, Corporate Representative Mark Kansley seems to state that to NCL, *partial impairment* is acceptable even though a "partially impaired" patron could be a risk to themselves or others.

Corporate Representative Mark Kansley 80 was asked for a person who participates in a pub crawl back in April of 2011, is there any prohibition that you're aware of on board the ship from that person participating in another activity involving alcohol later that day and he said, "guests are permitted to participate on the merits of how the guest is in that particular activity. We would not take into consideration whether they participated in any previous activities. We would take into consideration whether they are capable and in the right frame of mind to participate in that particular activity."

Corporate Representative Mark Kansley 81 was asked and there is no rule aboard NCL's vessels to disqualify or prohibit that person from necessarily participating in another alcoholic activity immediately following unless perhaps that person's conduct is an indicator that they perhaps had too much to drink. And in which case, there would be a separate set of rules that perhaps would come into play, is this correct to which he said, "yes. I do need to explain that those five drinks that you keep referring to are actually half drinks because they're only half pours." According to NCL, "regular" drinks are served in 1.5 or 2 ounce pours. Beyond Kansley's statement and NCL's answer to interogatories, there is no policy that states that pub crawl drinks are ½ a regular drink. In fact, if a pub crawl drink is in fact ½ ounce of alcohol, NCL's statement that the pub crawl is the cheapest bit of alcohol you will get on the cruise may be a purposeful misstatement and may represent consumer fraud.

Corporate Representative Mark Kansley 81 stated, "there would be nothing excluding them from going to -- if we were having a wine tasting seminar directly after that, no, there would be nothing if they were not impaired, preventing them from going to the wine tasting, for example."

Corporate Representative Mark Kansley 80 was asked for a person who participates in a pub crawl back in April of 2011, is there any prohibition that you're aware of on board the ship from that person participating in another activity involving alcohol later that day and he said, "guests are permitted to participate on the merits of how the guest is in that particular activity. We would not take into consideration whether they participated in any previous activities. We would take into consideration whether they are capable and in the right frame of mind to participate in that particular activity."

Corporate Representative Mark Kansley 81 was asked there is no rule aboard NCL's vessels to disqualify or prohibit that person from necessarily participating in another alcoholic activity immediately following unless perhaps that person's conduct is an indicator that they perhaps had too much to drink. And in which case, there would be a separate set of rules that perhaps would come into play, is this correct to which he said, "yes. I do need to explain that those five drinks that you keep referring to are actually half drinks because they're only half pours." According to NCL, "regular" drinks are served in 1.5 or 2 ounce pours.

Corporate Representative Mark Kansley 108 was asked is there any prohibition or rule with NCL that a pub crawl participant could not purchase another drink during the period that they're participating in the pub crawl and he said, "I don't believe so."

Ronald Spencer 25 was asked and stated that he drank all of the drinks on the pub crawl. Ronald Spencer 26 stated that in addition to the pub crawl, he went to the martini tasting.

Aubrey Laughrey 29 was asked so your group, and Ms. Doe stated on the back of the ship at the fantail bar for some time after the pub crawl to which he said yes. She said they were just hanging out talking. We ordered a bucket of beer.

**18. NCL fell below a reasonable standard of care in the development, implementation, distribution, and compliance monitoring of reasonable and effective alcohol service policies and as such, was not reasonable under the circumstances.** NCL provided 6 documents for review.

**19. Welcome Aboard.** The Welcome Aboard documents was identified for the Norwegian Sky, March 12, 2010. The document consisted of eight pages with only one page identifying anything having to do with alcohol service. On page 137 there is a statement that the ship contains "10 bars and lounges." The document contains no reference to responsible alcohol service or sales, responsible alcohol consumption, or guest safety. It is irresponsible and not reasonable under the circumstances not to address responsible alcohol retailing in the document.

**20. Norwegian Cruise Line, Security and Safety Guide.** The Norwegian Cruise line, security and safety guide consisted of 120 pages. There was no reference in the document at all to responsible alcohol sales and service or responsible alcohol consumption. The document appears to consist of points of contact with law enforcement agencies through which US citizens could report crimes. It is irresponsible and not reasonable under the circumstances not to address responsible alcohol retailing and alcohol related crimes in the document.

**21. Norwegian Cruise Line Company Policy – Cruise Programs: St. Patricks' Day, Super Bowl, Theme Parties.** The Norwegian Cruise Line Company Policy – Cruise Programs: St. Patricks' Day, Super Bowl, Theme Parties document consists of nine pages. The document contains no reference to the responsible sale or service of alcohol or the responsible consumption of alcohol. This is particularly

disturbing in that the events described in Norwegian Cruise Line Company Policy – Cruise Programs: St. Patricks' Day, Super Bowl, Theme Parties document carry with them a higher possibility of over-service and over-consumption.

The only mention of alcohol service practices in the Norwegian Cruise Line Company Policy – Cruise Programs: St. Patricks' Day, Super Bowl, Theme Parties document is actually a reference to a way to market increased alcohol consumption. The information on page 145 states in part, "Featured drinks promoted and advertised beforehand and at event. This is a good night to have the Bar Staff perform their Show or Mixology demonstration, with juggling, feats of balance and strength and mixing drinks with the staff, especially if near the beginning of the cruise, in order to promote personality and improve on guest relations with the Bar Staff. Only if show is tight, well performed and concise without interrupting the music and flow of the dancing." The information on page 147 states in part, "Featured drinks can include Bacardi, tequila, sangria and/or pisco. Sangria can be a featured drink, with fruits and snacks available. Games can include Hog Calling, Beer Chugging, and Blind Electric Slide Contest. Egg Drop contest (relay race) and finally they must chug a beer and eat a can of Spam between them." It is irresponsible and not reasonable under the circumstances not to address responsible alcohol retailing in the document. In addition, engaging in drinking games such as beer chugging seems to be contrary to NCL's written Beverage Alcohol Policy. The policy states in part: do not encourage overconsumption with excessive discounts or specials.

**22. Pub Crawl Policy.** The pub crawl policy is a one-page document that describes how the pub crawl is to be conducted. The policy describes in detail how the pub crawl will be organized and conducted. There is only one reference to responsible alcohol service. That reference states, "Head bartender does not only escort the guests but also make sure that every participant is of the right age. He even stopped service to guest if observed intoxicated and also close monitors the guests at all times."

The document goes into significant detail on the drinks that are served at each of the five bars plus the drinks served to the winning team. Not only is the drink listed for each bar, but the bartender assigned to the pub crawl in each of the five bars are also listed. The document states that the pub crawl will begin at 1:15 PM.

However, in spite of the extensive detail guiding employees in the conduct of the pub crawl, the policy makes no mention of the amount of alcohol to be served in each drink. The absence of a written policy creates a situation in which bartenders may choose to pour the drinks as they traditionally would if they were not participating in the pub crawl leading to the possibility of patron over-service. It is irresponsible and not reasonable under the circumstances not to address responsible alcohol retailing in the document. Except for the statement by Corporate Representative Mark Kansley that the pub crawl drinks are ½ a normal pour, there is no other evidence of that contained in any of the written materials.

**23. Beverage Alcohol Policy.** The beverage alcohol policy is contained within three pages. It is further identified as Hotel operations. MCL/NCL America; FB.03.43. Beverage alcohol policy. Effect of: 5/1/2009.

The beverage alcohol policy contains a *purpose statement* which states, "To establish a philosophy of prevention and proactive support toward responsible alcohol service on board."

The beverage alcohol policy contains a *policy statement* which tells employees:

- Do not serve or sell to those under 21 (either guests or crew). Guests 18 to 20 with parental consent can only be served beer and wine in international waters.
- Do not serve or sell to the obviously intoxicated.
- Do not serve or sell to known alcoholics.
- Do not encourage overconsumption with excessive discounts or specials.

This beverage policy only "tells" the employees what they were not to do. The policy did not create awareness or foster or encourage actions reasonably intended to prevent the occurrence. "Telling" without further support is not effective.

On its face, the beverage alcohol policy is insufficient and not reasonably intended to provide any meaningful information to NCL alcohol servers including pub crawl bartenders. The beverage alcohol policy states, "Do not serve or sell to the obviously intoxicated." However, the policy does not define what it means by *obviously intoxicated*. In fact, NCL uses two different standards for intoxication. In the NCL SEM Security document titled: alcohol incidents involving minors and guests, the words "obviously intoxicated" are used while in the beverage policy the word "intoxicated" is used. NCL makes no effort to neither explain the difference nor define each of these descriptors for the benefit of their employees. The evidence in this case is replete with examples of intoxicated patrons including Ms. Jane Doe. Yet, these intoxicated patrons were served alcoholic beverages. Corporate Representative Mark Kansley 88 was asked if this definition was written down somewhere and he said, "Yes, in our standard operating procedures with regards to beverage service." It was not.

Corporate Representative Mark Kansley 120 stated in my shipboard capacity where I have worked on board, I have seen guest that are intoxicated aboard the ship. How they became intoxicated, I could not tell you, but I have seen guest intoxicated aboard the ship. This represents additional possible evidence of violations of the NCL policy.

The beverage alcohol policy states, "do not serve or sell to *known alcoholics*." Again, the policy does not define or provide guidance to servers in identifying an alcoholic.

The beverage policy states, "do not encourage overconsumption with *excessive discounts or specials*." The pub crawl is a special offering, "Five drinks in the five bars in 55 min., can you handle? Join your fellow crawler and make lifelong friends. It's only $25 and the cheapest bid of alcohol you will get all cruise long! Time 1:15 p.m. Champs Bar, Deck 12, Fwd. Don't miss this!" On its face, but pub crawl encourages overconsumption with excessive discounts and specials. In addition, NCL's own policies set forth additional specials and discounts including martini tastings involving five different martinis, 2-for-1 drink specials, and specials such as St. Patrick's night and others previously identified. However, Corporate Representative Mark Kansley 100 stated, "we do not promote the overindulgence of alcohol. We offer alcohol for sale to our guest as part of their vacation experience, but everything within limits, within safe limits. We hold our crewmembers to that standard." Yet, that statement as expressed by Corporate Representative Mark Kansley is not reflected in NCL's written documents. A standard that is not written, trained to, and assessed is not a standard. It is only a management hope.