```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3          CASE NO:  11-22230-CIV-COOKE/TURNOFF

 4
       JANE DOE,
 5
               Plaintiff,
 6
       vs.
 7
       NCL(BAHAMAS) LTD.,
 8
               Defendant.
 9     _____/

10

11
                       C/O JEANNIE REPORTING
12                     Professional Development &
                       Conferencing Services
13                     300 Prince Phillip Drive
                       Faculty of Medicine, Health
14                     Science Centre, Room 1
                       St. John's, NL Canada A1B3V6
15                     Friday, September 21, 2012

16

17

18            DEPOSITION OF ROSS A. KLEIN, Ph.D.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:
      BRAIS & ASSOCIATES, P.A.
 4    New World Tower
      100 Biscayne Boulevard
 5    Suite 800
      Miami, Florida 33132
 6    BY:  Keith Brais, Esquire

 7

      ON BEHALF OF THE DEFENDANT:
 8    MASE LARA EVERSOLE, P.A.
      SBS Tower
 9    2601 South Bayshore Drive
      Suite 800
10    Miami, Florida 33133
      BY:  Curtis J. Mase, Esquire, (Via Video
11    Conference)

12

13

14

15                    - - - - - -

16                I N D E X

17                    - - - - - -

18    ROSS A. KLEIN, Ph.D.                     PAGE
      Direct Examination By Mr. Mase           3
19

20

21

22            EXHIBITS FOR IDENTIFICATION

23    PLAINTIFF'S                    PAGE
      NONE

24    DEFENDANT'S                    PAGE
      NONE

25
```

**JEANNIE REPORTING, INC.  (305) 577-1705**

1    Thereupon,

2    September 21, 2012

3                REPORTER:

4         Q.    Okay.  So we're ready to go on this

5    end.  I'll ask Dr. Klein now if he would like to be

6    sworn or affirmed.

7         A.    Affirmed.

8         Q.    Affirmed, okay.

9    DR. ROSS KLEIN, AFFIRMED, EXAMINATION-IN-CHIEF BY

10   MR. CURTIS MASE

11               REPORTER:

12        Q.    Please state your full name and

13   address for the record.

14        A.    Okay.  Ross Allan Klein, K-L-E-I-N.

15   Address is 6 Cormack Street, St. John's,

16   Newfoundland.  Postal Code A1E 4C9.

17        Q.    Thank you very much.

18               Mr. Mase?

19               MR. MASE:

20        Q.    All right.  You let me know if for any

21   reason you don't hear me.

22               Dr.  Klein, you've previously

23   provided, in connection with this case, a copy of

24   your curriculum vitae.  Does that fairly and

25   accurately depict your educational background,

1    training and professional history?

2         **A.**   Yes, it does.  Just to be clear, I've

3    given you two different copies.  I've given you one

4    that I sent to Mr. Brais back when I was first

5    contracted, which was an abbreviated, and then in

6    the electronic submission I provided him last

7    weekend, there is a more complete CV that's 20

8    pages.

9         **Q.**   Okay.  And I don't know whether I have

10   that more complete CV.  What I have is something

11   that was attached to Plaintiff's Expert Witness

12   Disclosure and that is -

13        **A.**   That's eight pages probably.

14        **Q.**   It is eight pages.

15        **A.**   Yeah, the difference between the two

16   is that the more complete one, which again it was

17   part of when I sent my file electronically.  The

18   more complete one has lots of stuff that has

19   nothing to do with my work around the cruise

20   industry, so publications that are totally

21   unrelated, courses I've taught, students that I've

22   supervised, that sort of thing.

23        **Q.**   Okay.

24             REPORTER:

25        **Q.**   Excuse me, this is Mr. Mase speaking

```
 1    now, is it?

 2              MR. MASE:

 3         Q.   Yes.

 4         A.   So the one you have does correctly and

 5    completely reflect my education, as well as my

 6    academic appointments and profession experience.

 7         Q.   Okay.  That's fine.

 8              MR. BRAIS:

 9         Q.   I might be able to pull it up.

10              MR. MASE:

11         Q.   So now you've prepared a declaration

12    in this matter, correct?

13         A.   Correct.

14         Q.   And I think that's about seven pages

15    long. It was prepared on July 1st?

16         A.   Correct, yes.

17         Q.   And does that contain your opinions

18    concerning this matter?

19         A.    It contains my opinions at that point.

20              There's probably one other item that I

21    would

22              add to it that came to my attention after

23    I

24              submitted my file and that was -

25         Q.   What is that?
```

1        **A.**    Relating to the Cruise Vessel Security

2    and Safety Act, I do discuss in my declaration the

3    issue of prevention included and the issues of the

4    --  that information be provided by passengers.

5    What I don't talk about also is within the Cruise

6    Vessel Security and Safety Act is a provision with

7    regard to video surveillance of areas on the ship

8    and that those video surveillance tapes would be

9    available in the case of a Court case.  So that

10   second part is something which I haven't previously

11   opined, however based on conversation and reviewing

12   the Act this week, it is an area that I might add

13   if this were to go to trial.

14        **Q.**    Well, let's talk about that.  I mean,

15   this is my opportunity to take your deposition, so

16   what opinions do you hold on Cruise Line Vessel

17   Security and Safety Act as it relates to videos?

18        **A.**    What I'd be referring to, and let me

19   just --

20        I'm going to pull up a copy of the Act

21   here so

22        that I can cite the correct section.

23   Hold on

24        a second.  Okay.  This is -- in the Act

25   it's under Section 3, paragraph B, under video

1    recording.  It states "1.  That the owner of a

2    vessel to which this section applies shall maintain

3    a video surveillance system to assist in

4    documenting crimes on the vessel and in providing

5    evidence for the prosecution of such crimes as

6    determined by the Secretary" and No.  2.  "The

7    owner of a vessel to which this section applies

8    shall provide to any law enforcement official

9    performing official duties in the course and scope

10   of an investigation upon request a copy of all

11   records of video surveillance that the official

12   believes may provide evidence of a crime reported

13   to the law enforcement officials."  My

14   understanding is in part derived from the

15   deposition taken from Mr. Fail is that there may

16   not have been sufficient cameras to cover all of

17   the public spaces that were at issue in this

18   particular case and my understanding from

19   correspondence which Mr. Brais shared with me

20   between his office and your office that there is a

21   problem with regard to having those tapes that do

22   exist made a valuable and a readable form.

23          **Q.**   Okay.  Let's just take this one at a

24   time.

25          **A.**   Okay.

1          **Q.**    In the Cruise Line Vessel Safety and

2      Security Act, does it detail how many cameras a

3      ship should have?

4          **A.**    No, it does not.

5          **Q.**    Does the Cruise Line Vessel Safety and

6      Security Act detail in any way, shape, form or

7      fashion, where the cameras should be?

8          **A.**    No, though in Mr. Fail's testimony, I

9      believe he stated that there would be cameras in

10     public areas and I'm not sure if he specifically

11     said in bars, but he did indicate that the effort

12     was to have operating cameras in all public areas.

13         **Q.**    Move to strike, it's non-responsive.

14     Talking about the Cruise Line Vessel Safety and

15     Security Act, does it require cameras be in a

16     specific location?

17         **A.**    No, it does not.

18         **Q.**    Does it require that cameras cover all

19     public areas?

20         **A.**    The Act does not require that.

21         **Q.**    Does the Act require that bars be

22     covered?

23         **A.**    No, it does not.

24         **Q.**    Casinos?

25         **A.**    No, it does not.

1          **Q.**    Bathrooms?

2          **A.**    No.

3          **Q.**    Hallways?

4          **A.**    No.

5          **Q.**    Outdoor areas where people could fall

6     if they weren't careful?

7          **A.**    It doesn't specify the areas but it

8     does say surveillance system to assist in

9     documenting crimes and the areas which you're

10    specifying are areas in which crimes occur.

11         **Q.**    Does the Cruise Line Vessel Safety and

12    Security Act provide any specifics as to where you

13    are required to have a camera?

14         **A.**    It doesn't state where but it does

15    state that the purpose of the cameras is to assist

16    in documenting crimes.

17         **Q.**    I understand that.  Okay.  So next

18    question, do you know how many cameras NCL has on

19    the subject vessel?

20         **A.**    Not precisely.  I believe -- I'm not

21    sure if -- I don't think Mr. Fail cited a number,

22    but I would say more than a thousand certainly.

23         **Q.**    Where do you come up with more than a

24    thousand?

25         **A.**    That would be based on my knowledge

1    from meetings where I've participated with industry

2    representatives where they've discussed the cameras

3    that have been on their vessels and in my memory

4    that was a number that -- or close to that number

5    was a number that would be cited.

6         **Q.**    Move to strike, it's non-responsive.

7    Mr. Klein, it's important to me this morning that

8    you not speculate and that you answer my questions

9    only based on what you do and do not know.  So I'm

10   going to ask once again.  Do you know the number of

11   cameras that were on this particular NCL vessel?

12        **A.**    Not precisely.

13        **Q.**    Okay.  Do you know the locations of

14   the cameras on this particular vessel?

15        **A.**    Only insofar as Mr. Fail's deposition

16   stated that there were cameras in public areas.

17        **Q.**    Okay.  So other than Mr. Fail's

18   testimony that there are cameras in public areas,

19   do you know the precise location of those cameras?

20        **A.**    No, I do not.

21        **Q.**    Have you looked at any diagrams about

22   where the cameras are located on this ship?

23        **A.**    I haven't been given any diagrams.

24        **Q.**    Okay.  Other than looking at Mr.

25   Fail's testimony, have you seen any other

1    information about camera location?

2          **A.**   No, I have not.

3          **Q.**   Have you yourself reviewed the

4    videotapes which have been produced to Mr. Brais?

5          **A.**   I have not -- I haven't seen them, but

6    part of the problem is that my -- is from what I'm

7    told they are not viewable because they're recorded

8    in a format specific to Europe that can't be read

9    by a North American machine.

10         **Q.**   Move to strike, it's non-responsive.

11   What you just described is what Mr. Brais has told

12   you, correct?

13        **A.**   Correct.

14        **Q.**   Are you aware that Mr. Brais has been

15   provided with a machine by NCL to watch the tapes?

16        **A.**   I don't know the details of that, no.

17        **Q.**   Have you yourself seen any of the

18   tapes at all?

19        **A.**   No, I have not.

20        **Q.**   Okay.  So with respect to the Cruise

21   Line Vessel Safety and Security Act, do you have

22   any opinions as it relates to the video

23   surveillance on board this ship?

24        **A.**   My opinion is my interpretation of the

25   Act and the background of the reason for the Act

1    was that the intent would be that there would be

2    video surveillance in public areas and so while the

3    vessel may not be out of compliance to the letter

4    of the law, I would say that they are out of

5    compliance with the spirit of the law.

6             **Q.**    Any other opinions?

7             **A.**    Not on that issue.

8             **Q.**    Okay.  Are you a lawyer?

9             **A.**    No, I'm not.

10            **Q.**    Ever been to law school?

11            **A.**    No, I have not.

12            **Q.**    Hold a legal degree anywhere?

13            **A.**    No.

14            **Q.**    Licensed to practice law anywhere?

15            **A.**    No.

16            **Q.**    Ever offer a legal opinion which was

17   accepted by a competent court?

18            **A.**    No, I have not.

19            **Q.**    Consider yourself qualified to

20   practice law?

21            **A.**    Not in the least.

22            **Q.**    I understand from your curriculum

23   vitae that predominantly your areas of expertise

24   are focused around social work with a particular

25   research interest in the cruise industry.  Is that

**JEANNIE REPORTING, INC.  (305) 577-1705**

```
 1   fair?

 2          A.     Not exactly.  My particular expertise

 3   is sociology.  My last two degrees were a Masters

 4   and Ph.D. in sociology.  Prior to that, I had a

 5   Masters degree in Social Work so that my interest

 6   in the cruise industry is approached from my

 7   sociological perspective and my sociological

 8   background.

 9          Q.     You're a professor of social work -

10          MR. BRAIS:

11          Q.     Wait, wait, please.  Sir Court

12   Reporter, are you there?

13          REPORTER:

14          Q.     I am, sir, yes.

15          MR. BRAIS:

16          Q.     You know, it's going to be difficult

17   for me to put objections in here so what I'll do is

18   I'll say aloud the word "form", F-O-R-M, and per

19   the protocol, at least in this jurisdiction, Mr.

20   Mase can ask me for the basis if he wants to,

21   otherwise I'll leave it at form, so it's the least

22   interruptive, but what you didn't hear was after

23   his last -- Mr. Mase's last question, I did place

24   an objection as to form and I want to make sure

25   that that's part of the record.  We can continue
```

```
1    now.  Thank you.

2              REPORTER:

3         Q.   I also want to make it understood that

4    when you do speak or interrupt, could you state

5    your name?  At least until -- for a little while

6    until the names are more common or the voice is

7    more common, please.

8              MR. BRAIS:

9         Q.   Do I sound like Mr. Mase?  I hope not.

10             REPORTER:

11        Q.   Okay.

12             MR. BRAIS:

13        Q.   That was just a failed attempt at

14   humour, folks.  Okay.  I'm going to turn it back

15   over to Mr. Mase.

16             MR. MASE:

17        Q.   All right.  This is Curtis Mase again.

18   Mr. Klein, so that I'm clear, you are a professor

19   of social work, is that right?

20        A.   Yes.  I am a professor of social work.

21        Q.   And you are a professor at Memorial

22   University in Newfoundland, St. John's, correct?

23        A.   Correct.

24        Q.   In Newfoundland, Canada, correct?

25        A.   Correct.
```

```
1            Q.    Okay.  And you have a primary area of

2     research and publication of the international

3     cruise industry and cruise tourism, correct?

4            A.    Correct.  If I can back up just one to

5     your prior question, in addition to being a

6     professor of social work, I'm also a professor in

7     the tourism program at Memorial University.

8            Q.    You didn't put that in your

9     declaration, did you?

10           A.    I don't believe I did, but it is on my

11    CV.

12           Q.    You run a website called

13    cruisejunkie.com right?

14           A.    Yes, I do.

15           Q.    And as nearly as I can tell, one of

16    your first times testifying in a cruise line case

17    was in '06.  Does that sound about right to you?

18           A.    No.  Well, the first case in which I

19    was involved as a witness providing an opinion was

20    in 2000 --  hold on, was in 2002.  It was a case

21    brought by a citizens group called Hui Hoopakele

22    Aina versus Hawaii and that was brought --  the

23    lawyers involved were Earth Justice.  That was

24    November 2002.

25           Q.    And at that time, you charged $100 an
```

1    hour for your time, right?

2         **A.**    Correct.

3         **Q.**    Today you charge 300 an hour with a

4    1,000 retainer, correct?

5         **A.**    Correct.

6         **Q.**    What's your total bill to date?

7         **A.**    My total bill to -

8         **Q.**    For this case.

9         **A.**    What I've billed so far is $1500 and

10   that's through July 1st.

11        **Q.**    Okay.  And then you're charging me

12   1200 bucks for your depo, right?

13        **A.**    Exactly.  Well, assuming four hours.

14        **Q.**    Okay.  In your declaration in

15   paragraph five -- do you have a copy of your

16   declaration?

17        **A.**    Yes, I do.

18        **Q.**    You identified the documents that you

19   have reviewed in formulating your opinions in this

20   matter.  Does that continue to be a complete list

21   of the documents you've reviewed?

22        **A.**    No.  I received some additional

23   documents this week and I provided to Mr. Brais

24   this morning a list of these.  I can go through

25   them if you'd like.

1      **Q.**    If you'd give me a list, that would be

2    helpful.

3           **A.**    Okay.  I'll read this to you for now

4    and then I can leave this, either e-mail this to

5    you or give it to the Court Reporter.

6           **Q.**    Okay.

7           **A.**    The additional materials were:  August

8    17th, the expert Lance Foster's report; Irvin Joe

9    Fail's deposition on June 21st; Dale Young's

10    deposition on June 18th; Magely Ramos deposition on

11    June 18th; Jose Vasquez deposition on June 19th;

12    Tabitha Vasquez deposition on June 19th; Portia

13    Stone deposition on June 20th; Patrick Laughrey

14    deposition on August 6th; and then I was also

15    provided a DVD of videos from You Tube, the

16    documentary "Cruise Inc." And the documentary

17    "Booze Cruise" though those items I was already

18    familiar with prior to receiving them.

19           **Q.**    Anything else?

20           **A.**    No, that's all.

21           **Q.**    Okay.  So then if I take that list

22    you've just now given me and your list in paragraph

23    five of your declaration, I have all the materials

24    you reviewed in reaching your opinions?

25           **A.**    Yes, you do.

```
 1              Q.    Now, and thank you, sir.  With respect
 2     to paragraph six of your declaration, you say that
 3     it's your opinion the cruise industry as a whole
 4     has an appreciation of the problem of sexual
 5     assault on cruise ships, right?
 6              A.    Correct.
 7              Q.    Okay.  And then you go on to say that
 8     there was a letter that as prepared in July 1999
 9     signed by certain cruise lines pledging zero
10     tolerance and a commitment to report, but you point
11     out that NCL did not sign that.  Is that right?
12              A.    That is correct.
13              Q.    Do you know why?
14              A.    I do not know the reason, no.
15              Q.    Okay.  What's the relevance or
16     importance of that to you that NCL didn't sign it?
17              A.    I don't draw any specific conclusion.
18     What for me is the purpose of that paragraph is to
19     identify that the problem of sexual assault had
20     been -- was recognized as an issue or as a problem
21     and that because it had been recognized by 1999
22     through the ICCL a number of cruise lines came
23     together to put out this document.
24              Q.    Okay.  So you don't draw any inference
25     one way or the other on that?
```

```
 1              A.    No.

 2                    MR. BRAIS:

 3              Q.    Form.  This is Keith Brais.

 4                    MR. MASE:

 5              Q.    Strike that.  Do you draw any

 6    inference from NCL's signature or non signature on

 7    that letter?

 8              A.    I don't know the reason for them not

 9    signing, so I can't draw an inference either

10    positive or negative.

11              Q.    Fair enough.  Now with respect to the

12    cruise industry's appreciation as a whole, do you

13    have an opinion as to whether NCL has an

14    appreciation of what you characterize as the

15    problem of sexual assault on cruise ships?

16              A.    Let me just think for a second how to

17    respond here.

18              Q.    And I can clarify my question for you.

19              A.    Okay.

20              Q.    You wrote in paragraph six it's your

21    expert opinion the cruise industry as a whole has

22    an appreciation of the problem of sexual assault on

23    cruise ships, including sexual assaults on NCL

24    ships, and I appreciate your offering that opinion

25    on the cruise industry as a whole, but so you
```

1      understand, the cruise industry as a whole is not a

2      party in this lawsuit, so I want to focus instead

3      for my question here on the party, which is NCL.

4      So I want to take your statement and ask you do you

5      have an opinion as to whether NCL has an

6      appreciation of the problem, as your characterize

7      it, of sexual assault on cruise ships, including

8      sexual assaults on NCL ships?

9                    MR. BRAIS:

10          **Q.**    Keith Brais.  Form.

11          **A.**    Whether they have an appreciation for

12      the problem, I guess is separate for me from the

13      fact that the problem exists on other cruise line

14      ships and presumably exists on NCL ships.

15                    The NCL ships have similar, if not

16      identical, approaches to security as best I can

17      tell and at least my experience on board NCL ships

18      in the mid 1990s reflected that there was not a

19      significant difference with regard to issues of --

20      in the way that officers and crew members acted

21      toward passengers in relation to other cruise lines

22      and that the nature of relations between passengers

23      did not appear to be significantly different.

24                    MR. MASE:

25          **Q.**    Move to strike as non-responsive.  How



**JEANNIE REPORTING, INC.   (305) 577-1705**

1   does the incidents of sexual assaults on NCL's ship

2   compare to the incidents of sexual assaults in the

3   cruise industry as a whole, if you know?

4       A.    In the period that we have data for

5   NCL, and that would be the three years prior to the

6   incident in this case, the proportion of incidents

7   with regard to a standardized rate --  and I didn't

8   come prepared with this particular comparison, but

9   my memory would be that the rate would be somewhat

10  similar to the rate on Royal Caribbean.

11      Q.    How about on Carnival?

12      A.    For that period of time, the rate on

13  Carnival would be significantly higher.

14      Q.    Okay.  How about on other cruise

15  lines?

16      A.    I don't have data for the other cruise

17  lines, so I can't make a meaningful comparison.

18      Q.    Okay.  You have actually looked

19  through in the past FBI statistics characterizing

20  sexual assault, sexual harassment, assault, et

21  cetera, and you've re-characterized matters which

22  the FBI did not consider sexual assaults as sexual

23  assaults based on the law of Canada?

24          Is that correct?

25      A.    Correct.  What I've tried to do is use

```
 1    a consistent definition for purposes of comparing

 2    the rate of sex related incidents on board cruise

 3    ships with the same definition of sex related

 4    incidents in Canada.  The reason why I'm using

 5    Canada as the point of comparison is that the US

 6    does not have a rate for sexual assault that would

 7    allow for proper comparison.

 8         Q.   But what you've done is you've looked

 9    at the FBI's crime statistics and looked at how

10    they characterized incidents and you've actually

11    taken incidents they did not denominate as sexual

12    assault and you've denominated them as sexual

13    assault for your comparison based on Canada's

14    description of sexual assaults, right?

15              MR. BRAIS:

16         Q.   Keith Brais.  Form.

17         A.   I'd have to go back and look at the

18    specific ones to be able to know precisely which

19    ones I changed and how I changed them.  So, I can't

20    concede your point at this point.

21              MR. MASE:

22         Q.   But you do agree with me that you have

23    taken a look at reported incidents which the FBI

24    did not characterize as sexual assaults and re-

25    characterized them as such under Canadian law,
```

```
 1    true?
 2                 MR. BRAIS:
 3            Q.   Keith Brais.  Form.
 4            A.   What I had were those cases which NCL
 5    reported to the FBI and in reading them, I used the
 6    label that was -- that in my interpretation would
 7    apply under Canadian law.
 8                 MR. MASE:
 9            Q.   So in other words, what you did was
10    you applied Canadian law to factual incidents
11    reported by NCL to decide whether you believe they
12    were sexual assaults, correct?
13                 MR. BRAIS:
14            Q.   Keith Brais.  Form.
15            A.   I have to explain the reason for what
16    I did as a -
17                 MR. MASE:
18            Q.   No, I -
19            A.   - because as a social scientist, I
20    cannot commit the same error that the cruise
21    industry's expert committed by mixing labels and
22    then trying to draw a comparison.  The only way I
23    can, as a social scientist, draw a comparison
24    between a set of data in one setting with a set of
25    data in another setting is to use comparable
```

1     definitions and certainly as a social scientist

2     what I have done can be reviewed and can be

3     verified or be disagreed with.

4              Q.    Move to strike as non-responsive.  And

5     in doing what you just described, you utilized the

6     description under Canadian law of sexual assault

7     for purposes of making your comparisons, correct?

8              MR. BRAIS:

9              Q.    Keith Brais.  Form.

10             A.    I interpreted what was written in the

11    report and assigned a label that would be

12    comparable to a place that I could compare the

13    statistics to.

14             MR. MASE:

15             Q.    Which was Canada?

16             A.    Correct.

17             Q.    So you used the definition that Canada

18    uses for sexual assault in denominating whether an

19    incident was or wasn't a sexual assault for purpose

20    of your comparison.  Is that fair?

21             A.    That's fair.

22             MR. BRAIS:

23             Q.    Keith Brais.  Form.

24             MR. MASE:

25             Q.    In your footnote 1 on page two, you



1    say that it's not uncommon for a case of sexual

2    assault to be mislabelled as a case of sexual

3    harassment.

4         **A.**    Correct.

5         **Q.**    Okay.  What do you base that on?

6         **A.**    The definition I'm using for sexual

7    assault is unwanted sexual touching and I have seen

8    in FBI materials and I've seen in materials from

9    other cruise lines submitted in discovery cases of

10   let's say a waiter touching a teenager's breast

11   listed as either inappropriate touch or as sexual

12   harassment.

13        **Q.**    So your definition derives from what

14   you understand to be Canadian law, correct?

15        **A.**    Correct.

16        **Q.**    Okay.  So you're not attempting to

17   derive your definition of sexual assault based on

18   US law?

19        **A.**    No, I am not because -- no, no.

20        **Q.**    Okay.  And as far as what's been

21   mislabelled, you don't know whether any of NCL's

22   disclosed incidents that you have seen produced in

23   discovery here, you don't know whether those were

24   mislabelled, do you?

25        **A.**    I don't have enough data on which to

**JEANNIE REPORTING, INC.   (305) 577-1705**

```
1         draw any judgment.

2              Q.    So the disclosure that's made by NCL

3         that's been provided to you by Mr. Brais, you're

4         not in a position to say one way or the other

5         whether there was any mislabelling, true?

6              A.    That is correct.

7              Q.    Okay.  Now you mentioned, on the top

8         of page three of your report, you mentioned -- and

9         I'm going to go back to page two to read through

10        the whole sentence because I want to be fair.

11             You talk about the fact that -- bottom of

12        page two.  "Given ongoing attention" and so forth

13        -- "cruise industry, of which NCL is a part, was

14        aware or at least should have been -- should have

15        known of the seriousness of the problem."  And I

16        guess you're talking about seriousness of the

17        problem of sexual assault, correct?

18             A.    Correct.

19             Q.    And then you go on to talk about your

20        own -- you go on to talk about five congressional

21        hearings and so forth and you cite to Section 2 of

22        the Cruise Line Vessel Safety and Security Act and

23        then you go on and talk about NCL's security guide,

24        right?

25             A.    Correct.
```



1      **Q.**    All right.  So let's talk first and

2    foremost about NCL's security guide.  You've had an

3    opportunity to review that, correct?

4            **A.**    Correct.

5            **Q.**    Okay.  And a security guide is

6    something which the Cruise Line Vessel Safety and

7    Security Act required cruise vessels have on board,

8    correct?

9            **A.**    Well, hold on a second.  It's a

10    requirement -- hold on a second.  It doesn't state

11    in the Act that it necessarily should be on board.

12    However, one would think that it would be on board.

13            **Q.**    Okay.  So you would agree then that

14    it's something where it makes sense to have it on

15    board, but the Act doesn't actually require it,

16    correct?

17            **A.**    Correct.

18            **Q.**    Okay.  And NCL does in fact have a

19    security guide, correct?

20            **A.**    They have one on their website, but as

21    I point in my opinion, it isn't very easily found.

22            **Q.**    I understand that.  Now there's no

23    requirement that it be on the website, is there?

24                MR. BRAIS:

25            **Q.**    Form.

```
 1              A.    No, just that it be -- that it be
 2      available for each passenger.
 3                    MR. MASE:
 4              Q.    Okay.  Let me ask my question again.
 5      Does the Cruise Line Vessel Security and Safety Act
 6      require that the security guide be on the website?
 7              A.    No, it does not.
 8              Q.    Okay.  Does NCL place theirs on the
 9      website?
10              A.    They have a one-page statement on
11      their website, yes.
12              Q.    Okay.  Does NCL have their security
13      guide on board its vessels, to your understanding?
14              A.    I believe what they have on the
15      website is also available on their vessels.  I
16      believe I saw that in some of the depositions.
17              Q.    Okay.  Do you understand that it's
18      available in each cabin?
19              A.    Again, I believe that's what I did see
20      in the depositions.
21              Q.    Okay.  And would you agree that that's
22      not something that's required by the Cruise Line
23      Vessel Safety and Security Act?
24                    MR. BRAIS:
25              Q.    Keith Brais.  Form.
```



**JEANNIE REPORTING, INC.  (305) 577-1705**

```
 1            A.    I would say it is required, if not in
 2     the cabin, in some other way that it be available
 3     to every passenger.  So being in the cabin is
 4     certainly an efficient means for that to be
 5     achieved.
 6                  MR. MASE:
 7            Q.    Okay.  Now the Cruise Line Vessel
 8     Safety and Security Act contains some description
 9     of what the security guide should have in it,
10     correct?
11            A.    Correct.
12            Q.    And it requires, for example, that it
13     be written in English, be plain stated, correct?
14            A.    Correct.
15            Q.    It requires it describe the medical
16     and security personnel and you know, who might
17     respond to a crime or medical situation, correct?
18            A.    Correct.
19            Q.    Does NCL's guide do that?
20            A.    Hold on a second.  It does address the
21     -- okay, just hold on a second.  It does indicate
22     to whom -- yes, okay, it does satisfy that
23     requirement, the medical and security personnel.
24            Q.    When you looked through the security
25     guide, as I was reading through your report and
```

1     your opinion, your primary concern or complaint, if

2     you will, was that it does not provide a warning to

3     passengers that sexual assaults have occurred on

4     NCL ships.  Is that true?

5             A.    Correct, and what I'm drawing on is in

6     that paragraph that you just cited in terms of

7     medical and security personnel, it says "provides a

8     description of medical and security personnel

9     designated on board to prevent and respond to

10    criminal and medical situations."

11            Q.    So then if I understand your opinion,

12    your opinion is that NCL's security guide does not

13    meet the requirements of the Cruise Line Vessel

14    Security and Safety Act?  Is that right?

15            A.    That would be my opinion, yes.

16            Q.    Okay.  And you also believe that one

17    of the reasons it doesn't meet it is because it

18    doesn't warn passengers that sexual assaults have

19    occurred on NCL ships, correct?

20            A.    That specifically, but more generally,

21    it doesn't address the issue of prevention.

22            Q.    Okay.  Let me ask you this, does the

23    Cruise Line Vessel Safety and Security Act explain

24    how the security guide is to address prevention?

25            A.    Not specifically, no.

```
 1          Q.    Does it say that cruise lines need to

 2    warn passengers of any prior crimes that have

 3    occurred?

 4          A.    Well, it says the guide should include

 5    prevention.

 6          Q.    Move to strike, move to strike.  Sir,

 7    Court Reporter, would you please read my last

 8    question back again?

 9                REPORTER:

10          Q.    I can't.  It's a digital recording, so

11    unless I interrupt it and find -

12                MR. MASE:

13          Q.    Never mind.  Mr. Klein, does the

14    Cruise Line Vessel Safety and Security Act require

15    that NCL or a cruise line disclose prior crimes

16    which have occurred?

17          A.    Not specifically.

18          Q.    Okay.  And on the top of page four in

19    your report, you offer the opinion that the law

20    requires that in the exercise of reasonable care

21    passengers minimally be adequately warned in

22    advance of travelling on a cruise ship that they

23    are at risk of sexual assault or rape.

24                Are you referring to the Cruise Line

25    Vessel Safety and Security Act?
```

1    **A.**    Yes.   My interpretation of the Act

2    insofar as the word "prevent" is being used does

3    suggest that implication.

4    **Q.**   Can you tell me where in the Cruise

5    Line Vessel Safety and Security Act it says that?

6    **A.**   Well, when it says provide a

7    description to prevent criminal and medical

8    situations, I would think that one of the elements

9    of preventing is to make people aware of the risks

10   that they are -- the risks that exist in the cruise

11   ship environment.

12   **Q.**   Move to strike as non-responsive.

13   Sir, can you cite me to the provision in the Cruise

14   Line Vessel Safety and Security Act which requires

15   passengers be adequately warned in advance of

16   travelling that they're at risk of sexual assault

17   or rape?

18   **A.**   The Cruise Ship Safety -- the Cruise

19   Vessel Security and Safety Act requires that there

20   be a focus on prevention and so what I am saying is

21   two things.  I'm saying, number one, that the

22   prevention element is not in the guide and the

23   second thing I'm saying is that by making

24   passengers aware of the risk, that is a method of

25   prevention.

```
1              Q.   Is that the basis for your opinion

2      expressed at the top of page four that we've been

3      discussing?

4              A.   Let's see.  Yes, it is.

5              Q.   Do you have any other basis for that

6      opinion?

7              A.   More broadly, knowing that sexual

8      assaults are known to be a problem and that at

9      least the analysis I've done of data indicates that

10     some areas of a ship are more risky than others and

11     some passengers are more vulnerable than others, so

12     that's all part of informing the opinion that I

13     expressed.

14             Q.   Any other basis for the opinion that

15     the law requires that passengers be warned of this

16     risk?

17             A.   I think that's it for now.

18             Q.   We're going to take just a little one

19     minute break here, just for a second, and then

20     we'll be back, if that's okay with you?

21             A.   Sure, sounds good.

22                  (OFF RECORD)

23                  MR. MASE:

24             Q.   I'm not completely sure where we left

25     off, but I'll try to -
```

1          **A.**    I think it was page four.  I think we

2     had completed -

3          **Q.**    I think that's right, up top.

4          **A.**    Yeah.

5          **Q.**    Okay.  So then I think I understand

6     your views on the Cruise Line Vessel Safety Act as

7     it relates to the disclosure.  You reach the

8     conclusion, at the bottom of paragraph six of your

9     declaration on page four at the top, that "simply,

10    passengers are not given a warning that they are at

11    risk of being sexually assaulted or raped and

12    warning sufficient to take precautions to prevent

13    being a victim of crime."  That's your conclusion?

14         **A.**    Yes, it is.

15         **Q.**    And what exactly do you believe in the

16    nature of a warning passengers should be given that

17    would be sufficient to take precautions to prevent

18    being a victim of crime?

19         **A.**    In the ideal, there would be an

20    indication acknowledging that sexual assaults are

21    known to occur on cruise ships and that the

22    likelihood or the risk of sexual assault is

23    increased when one is intoxicated and for that

24    reason, people should be -- to take proper

25    precautions.  At a minimum, I would suggest in the

```
 1    security guide that while they list people going

 2    overboard, kidnapping, assault, serious bodily

 3    injury --  I'm sorry, they do include sexual

 4    assaults, my apology.  So I think the security

 5    guide could probably be a bit more explicit with

 6    regard -

 7         Q.    But it actually does mention sexual

 8    assault, doesn't it?

 9         A.    Yes, it does.

10         Q.    Okay.  Let me ask you a question.  The

11    risk of sexual assault is increased when people are

12    under the influence of alcohol, correct?

13         A.    As best we know from the research

14    that's been done, yes.

15         Q.    Okay.  And that's true whether you're

16    at sea or on land, correct?

17         A.    That's correct.

18         Q.    Okay.  And in fact, there's some

19    statistics the FBI has put out concerning the

20    incidents of alcohol involvement in sexual

21    assaults, correct?

22         A.    Yes, they have.

23         Q.    And well over 50 percent of all sexual

24    assaults that occur on land have an alcohol

25    component to them, correct?
```

1          **A.**    Correct.

2          **Q.**    And a percentage of them have a drug

3     component, correct?

4          **A.**    Correct.

5          **Q.**    And you would agree with me that an

6     individual can be assaulted on land or at sea,

7     correct?

8          **A.**    That is correct.

9          **Q.**    They can be assaulted, sexually

10    assaulted on a airplane, correct?

11         **A.**    In theory, yes.

12         **Q.**    In other words, the locations where an

13    individual can be sexually assaulted are as varied

14    as the locations people can be in in life, true?

15         **A.**    That's correct.

16         **Q.**    Disney World?

17         **A.**    Correct.

18         **Q.**    Movie theatre?

19         **A.**    Correct.

20         **Q.**    St. John's, Newfoundland, Canada?

21         **A.**    Correct.

22         **Q.**    Okay.  So, and let me ask you this, in

23    local bars where you live, have you ever seen any

24    warnings that indicate that the risk of sexual

25    assault is increased by the consumption of alcohol?

```
 1          A.    I don't frequent the bars here, so I

 2    can't say with any certainty one way or the other.

 3          Q.    Well, how about in your travels and

 4    other bars that you may have had occasion to come

 5    across outside of there, have you ever seen a sign

 6    or a warning that indicated that there's an

 7    increased risk of sexual assault because you're --

 8    by those who consume alcohol?

 9          A.    I haven't seen that per se, however I

10    have seen in some places, I mean, Australia, for

11    example, is very vigilant with regard to posting

12    with regard to the not serving of alcohol to

13    anybody that shows any form at all of intoxication.

14          Q.    Move to strike as non-responsive.  But

15    with respect to any kind of a warning about sexual

16    assault risk being increased with the consumption

17    of alcohol, you've never seen that as a warning

18    sign posted anywhere, have you?

19          A.    No.

20                MR. BRAIS:

21          Q.    Keith Brais.  Form.

22                MR. MASE:

23          Q.    Okay.

24          A.    Though those other locations don't

25    claim in their advertising to be safe.
```

1      **Q.**    You don't believe airlines claim that

2    they're safe?

3      **A.**    They don't promote themselves in the

4    same way as the cruise industry saying they're the

5    safest mode of commercial transportation, nor do

6    they make claims that you're going to be safe on an

7    airplane.

8      **Q.**    Well, how about some of these places

9    down in the Caribbean, for example resorts in

10   Mexico, resorts in Costa Rica, resorts down in

11   Haiti, Dominican Republic, all through the Bahamas,

12   Atlantis for example, those are all resorts which

13   make a claim of safety, isn't it?

14     **A.**    I haven't seen advertising for those

15   countries or those locations which make a claim

16   that's comparable to the claim that the cruise

17   industry makes.

18     **Q.**    Before we talk about that, and we will

19   momentarily, we've covered, I believe, your

20   opinions as it relates to the Cruise Line Vessel

21   Safety and Security Act, is that true?

22     **A.**    Yes, it is.

23     **Q.**    Do you have any other opinions that

24   relate to the Cruise Line Vessel Safety and

25   Security Act that we have not talked about?

1    **A.**    Not that I can think of.

2    **Q.**    Okay.  Let's move on now to this

3    business about the cruise lines claiming they're a

4    safe mode of commercial transportation.  The quote

5    which has been attributed to a cruise line industry

6    association is "the US Coast Guard conducted a

7    comprehensive safety study that concluded the

8    cruise industry is the safest mode of commercial

9    transportation."  That's the quote or part of the

10   quote that you cite in paragraph seven, correct?

11   **A.**    Correct.

12   **Q.**    Now that statement itself is true.

13   The Coast Guard did conduct that study and did

14   reach that conclusion, correct?

15   **A.**    Well, I want to -- technically yes,

16   but the study didn't cover issues of sexual

17   assault.

18   **Q.**    Okay.  But let's be clear though, the

19   Coast Guard did in fact conduct a safety study of

20   the cruise industry.  Is that a fact?

21   **A.**    No, they compared existing statistics

22   of the cruise industry, US air carriers and motor

23   vehicles with regard to three types of casualties.

24   **Q.**    Right.

25   **A.**    And based on that comparison, they

**JEANNIE REPORTING, INC.   (305) 577-1705**

1    made that statement and that statement was made, I

2    believe, in 1996.

3           Q.   So what you take issue with is that

4    you don't believe the Coast Guard was looking at

5    issues of crime?  Is that correct?

6           A.   Well, that's one issue and that the

7    cruise industry in response to the issue of crime

8    when it is raised as a concern throws out this

9    statement as their defence.

10          Q.   Well, first of all, you would agree

11   that NCL doesn't throw this statement out.  You're

12   talking more broadly about the cruise industry,

13   correct?

14               MR. BRAIS:

15          Q.   Keith Brais.  Form.

16          A.   None of the cruise lines individually

17   make this statement.  The statement is made on

18   behalf of the Cruise Lines International

19   Association which speaks on behalf of its member

20   cruise lines and NCL, as a member of CLIA, has not

21   distinguished itself as differing in the opinion

22   that's expressed by the association to which

23   they're a member.

24               MR. MASE:

25          Q.   Okay.  Let me ask you this question.

```
 1    Has the Coast Guard or any other recognized

 2    governmental entity conducted a safety study of

 3    crime, including sexual assaults, which compares

 4    the cruise industry to air carriers and motor

 5    vehicles?

 6         A.   To my knowledge, there's been no such

 7    study undertaken.

 8         Q.   So then with respect to the only

 9    studies that have been undertaken by the United

10    States Coast Guard of safety, comparing cruise

11    lines to US air carriers and motor vehicles, the

12    Coast Guard's conclusion that the cruise line is

13    the safest mode of commercial transportation

14    continues to stand to this day.  Is that right?

15         A.   It stands in so far as what they

16    compared each of the types of transportation on.

17    The problem is that the cruise industry chooses to

18    extend that statement beyond the parameters to

19    which that statement applies.

20         Q.   You would agree with me that

21    passengers on board ships are generally safe,

22    correct?

23              MR. BRAIS:

24         Q.   Keith Brais.  Form.

25         A.   I would say that passengers on board
```



**JEANNIE REPORTING, INC.   (305) 577-1705**

```
 1        ships are less safe than they're led to believe and
 2        that with regard to some crimes, they are less safe
 3        on board the ship than they are on land.
 4                MR. MASE:
 5            Q.   But you'd also agree with me that one
 6        is more safe on a cruise ship than unsafe, correct?
 7                MR. BRAIS:
 8            Q.   Keith Brais.  Form.
 9            A.   If what you're asking is is the
10        incidence of crime less than 50 percent then I
11        would say yes, one is more safe than unsafe.
12                MR. MASE:
13            Q.   No, that's not what I'm asking.  For
14        your average passenger, you would agree there's a
15        level of safety, true?
16                MR. BRAIS:
17            Q.   Keith Brais.  Form.
18            A.   There is a level of safety, but the
19        question is whether the level of safety, how that
20        compares to safety in other locations.
21                MR. MASE:
22            Q.   The likelihood of something bad
23        happening to a passenger is relatively small, true?
24                MR. BRAIS:
25            Q.   Keith Brais.  Form.
```

1          **A.**    We can only make statements -- and

2      again, I'm speaking here as a social scientist.  I

3      can only make statements that are relative of one

4      location to another location.  So, I can only speak

5      in terms of what is the incidence of crime on board

6      a cruise ship versus on land, so that I can give

7      you a statistic for the number of robberies, the

8      number of thefts on a cruise ship and I can say

9      with confidence that one is less likely to

10     experience theft on board a cruise ship than likely

11     anywhere else -- or not likely anywhere else, but

12     certainly no worse and probably better than other

13     locations that they would be in.

14               MR. MASE:

15         **Q.**    Would you agree that the likelihood of

16     something bad happening to a passenger on board a

17     cruise ship is relatively small?

18               MR. BRAIS:

19         **Q.**    Keith Brais.  Form.

20         **A.**    I wouldn't use that language.  I can

21     only --

22               again, as a social scientist, I need to

23     use comparative language and the words you're using

24     is making an absolute statement.

25               MR. MASE:

**JEANNIE REPORTING, INC.   (305) 577-1705**

1          **Q.**     Would you say that on board a cruise

2     ship one is more safe than unsafe?

3               MR. BRAIS:

4          **Q.**     Keith Brais.   Form.

5          **A.**     Again, if by more safe versus less

6     safe we're talking 50/50 as a dividing point, I

7     would say yes, people are more safe.   They're more

8     likely not to experience a crime than they are to

9     experience a crime.

10              MR. MASE:

11         **Q.**     In your book, "Cruise Ship Blues" you

12     wrote on page 81 that the risk of accidents, attack

13     and disease on board the ship is relatively small.

14          Do you stand by that statement?

15         **A.**     At the time at which I wrote it, it

16     reflected what I knew and what I believed.   After

17     writing that, I became aware of the scope of the

18     problem, including data on the incidence of sexual

19     assaults and other crimes and so, I think I've

20     stated that differently in my subsequent writings.

21         **Q.**     Sir, you are of the opinion that

22     cruise ship passengers only have a small duty of

23     responsibility for themselves on board the ship,

24     true?

25         **A.**     No.   What I would say is that the

1    responsibility people have for themselves is based

2    on the information that they're given.

3              In the absence of information of risk,

4    it's very difficult to take greater responsibility

5    for yourself.  I'll use as an example, parents take

6    their children on cruise ships thinking their

7    children are virtually safe and they let their

8    children run around without supervision.

9              They participate in programs, including

10   youth programs, and you know, there is a proportion

11   of children who are sexually assaulted because of

12   lack of proper supervision by parents.

13             That's a case where without adequate

14   information of the risk, one is not able to take

15   proper responsibility for prevention of risk.

16        Q.   Are you able to offer an opinion here

17   today as to whether the rate of sexual assaults on

18   board this particular NCL ship was higher than the

19   rate of sexual assault in Dallas, Texas during the

20   comparable time period?

21        A.   I don't have that data in front of me.

22             However, I would take exception with

23   isolating this ship from the cruise line because

24   this ship is part of a corporation and there is a

25   comparable approach to security on board the ships.

**JEANNIE REPORTING, INC.   (305) 577-1705**

1    There is a comparable marketing to a common

2    clientele.  The crew members on this ship also are

3    on other ships, so I cannot isolate this ship per

4    se from the other ships and the cruise line as a

5    corporation.

6          Q.    Move to strike as non-responsive.

7    With respect to NCL and the rate of sexual assault

8    on board its cruise ships, do you believe -- do you

9    have an opinion as to whether that is less than,

10   greater than or equal to the rate of sexual

11   assaults in Dallas, Texas?

12         A.    I cannot answer that question in part

13   because I don't have the data for Dallas, Texas,

14   but also because my knowledge of statistics in the

15   US is they do not keep rates, at least under the

16   Uniform Crime Statistics, for sexual assault.

17         Q.    Okay.  I'd like for you to assume, for

18   purposes of our discussion, that there were 505

19   reported rapes annually on average in Dallas, Texas

20   with a population of 1.3 million people in 2010.

21   Based on that assumption, is the incidence of

22   sexual assault on NCL higher or lower than Dallas,

23   Texas?

24              MR. BRAIS:

25         Q.    Keith Brais.  Form.



**JEANNIE REPORTING, INC.  (305) 577-1705**

```
 1           A.    Just give me one second.  I would need

 2     to actually do the computation for NCL because,

 3     first of all, depending on the definition of sexual

 4     assault for Dallas, that becomes important, but I

 5     would need to do a quick computation of what the

 6     rate is for NCL for that same period of time.

 7                 MR. MASE:

 8           Q.    Okay.  So right now you don't have an

 9     opinion?

10           A.    Right.  I would need to do the

11     computations and then I could come up with a very

12     precise answer.

13           Q.    But as we sit here today, you do not

14     have an opinion on that?

15           A.    Not without confirming the data and

16     confirming the definitions used for Dallas, yeah.

17           Q.    I understand that, but my problem is

18     this is your deposition today, so my question to

19     you is do you have an opinion on that, sitting here

20     today?

21                 MR. BRAIS:

22           Q.    Form.  Asked and answered.

23           A.    In the absence of data, I cannot offer

24     an opinion.

25                 MR. MASE:
```

```
 1                   Q.    So you do not have an opinion right
 2       now?
 3                         MR. BRAIS:
 4                   Q.    Form.  Asked and answered.  Keith
 5       Brais.
 6                   A.    Right.  In the absence of data, I do
 7       not have an opinion.
 8                         MR. MASE:
 9                   Q.    Okay.  You've never taken a formal
10       class on the cruise industry, have you?
11                         MR. BRAIS:
12                   Q.    Keith Brais.  Form.
13                   A.    What do you mean by formal class?
14                         MR. MASE:
15                   Q.    Like a class on the -- do you teach
16       classes there?
17                   A.    Yeah.
18                   Q.    Did you ever take a class on the
19       cruise industry?
20                   A.    I guess lecture on the cruise industry
21       in classes in the tourism program.  I guess lecture
22       in courses around --  when I visit universities
23       around the world on cruise -- in classes on tourism
24       and in tourism management.
25                         So you know, I guess, teaching the
```



1    material is different than taking the course.  So,

2    in terms of taking a formal course, that is not the

3    source of my knowledge of the cruise industry.

4         **Q.**   Do you consider yourself an expert on

5    security?

6         **A.**   I haven't been qualified as an expert

7    on security and I wouldn't claim to have the level

8    of expertise that somebody --  that others who have

9    done considerable work in that area would have.

10        **Q.**   So would it be fair to say you're not

11   a security expert?

12        **A.**   Not for purposes of this case.

13        **Q.**   Have you ever been qualified in any

14   court in the United States as a security expert?

15        **A.**   No, I have not.

16        **Q.**   How about in Canada?

17        **A.**   No, I have not.

18        **Q.**   Anywhere else?

19        **A.**   No.

20        **Q.**   You have training in inferential

21   statistics, correct?

22        **A.**   Yes, I do.

23        **Q.**   Conceptually, the idea behind that is

24   prediction, correct?

25        **A.**   Well, probability rather than -- so in

1    the sense probability would lead to a type of

2    prediction, yes.

3          **Q.**    And that's predominantly based upon

4    past statistics of past events, correct?

5          **A.**    Correct.

6          **Q.**    Do you have any training in profiling?

7          **A.**    Only insofar as one would use

8    statistical techniques to identify characteristics

9    of certain populations.

10          **Q.**    All right, sir.  In paragraph seven,

11    you discuss the manner and method of computation of

12    sexual assaults employed by the industry.

13          You're familiar with your paragraph

14    seven?

15          **A.**    Yes, I am.

16          **Q.**    And when I read through this,

17    basically what you talk about is that uniform crime

18    statistics look at the per incident rate by 100,000

19    population, correct?

20          **A.**    Correct.

21          **Q.**    And the cruise lines, when they look

22    at the incident rate, they look at the passengers

23    carried, correct?

24          **A.**    Incorrect.

25          **Q.**    How do they look at it?

1    **A.**    When their expert testified before

2    Congress in 2006, they used the exact same method

3    that I'm using.  In fact, I used the method I'm

4    using because I wanted to have data that was

5    comparable to his data, so I used his method.

6         He used -

7    **Q.**    Explain the method to me.

8    **A.**    Okay.  What you take is what is the

9    average daily population on board either cruise

10   ships as an industry or cruise ships within a

11   cruise line.  You take the average daily

12   population.

13        You take the number of crimes that have

14   been counted and you compute a rate of incidence

15   per 100,000 population.

16   **Q.**    And that population that you're

17   averaging, that average population, either by

18   industry or by cruise line, you're taking a look on

19   a given day, correct?

20   **A.**    Actually, what one takes is the number

21   of passenger days per year.  You divide that by 365

22   which gives you the average number of passengers

23   per day.  Then you take --  you compute from that a

24   proportion that would be the number of crew members

25   on board the ship and I believe the number used by

1    James Fox was .43, so I used the .43 to come up

2    with the number of crew members, add the crew

3    members to the number of passengers and that gives

4    you your average daily population.

5        **Q.**    Okay.  And that's what, .43 crew per

6    passenger?

7        **A.**    If I remember correctly, that is the

8    numbers that were used.  Actually, I can give you

9    that in -- I think pretty quickly and confirm that

10   that's what the number was.  .4349675411.

11       **Q.**    Okay.  Now when you compare the cruise

12   line numbers to a population number of say per

13   100,000, one of the principle differences is that

14   the population on a cruise line turns over on

15   average about each week, correct?

16       **A.**    Right, but we're keeping a standard

17   average daily population, so it's comparable to the

18   average daily population of the City of Miami or

19   the State of Florida.

20       **Q.**    Move to strike as non-responsive.  I

21   understand what you're saying, sir, but what I'm

22   trying to understand is that you would agree with

23   me that if we look at a city of 100,000, you're not

24   going to see the kind of turnover on a weekly basis

25   that you would see in the average daily population

1     on a cruise ship, correct?

2          **A.**   I don't -- I agree with you, but that

3     has nothing to do with the computation of rates.

4          **Q.**   Well, and I move to strike the last

5     part of your answer as non-responsive.  Let me ask

6     you this.  You would agree with me that the

7     turnover of population in a city is vastly

8     different than the turnover of population on the

9     cruise ships, correct?

10          **A.**   The turnover of people on the cruise

11    ship is greater than a city.  The change in the

12    daily population on a cruise ship is comparable to

13    the change in the population in a city.

14          **Q.**   Okay.  So, in other words, what you're

15    saying is that the number of human beings, if you

16    will, in the daily population on either a cruise

17    line ships or the cruise industry as a whole, the

18    number of people is a comparable number to compare

19    to a population number, correct?

20          **A.**   If we're trying to deal with a rate

21    per 100,000, it's the only way that a reasonable

22    social scientist would be able to do this.

23          **Q.**   But you would agree with me that the

24    one variable that you can't account for is that

25    about every week, while the number of people may



**JEANNIE REPORTING, INC.   (305) 577-1705**

1    stay static, the actual individuals change,

2    correct?

3         **A.**    Correct, but the parallel then is that

4    we would need to consider the number of visitors

5    who come to Florida in addition to the population

6    if we were computing a crime statistic for Florida

7    because those visitors are coming and going.  So

8    rather than a population of I think somewhere

9    around 20 million, there's about 84 and a half

10   million visitors, so we would need to include those

11   in computing the rate for Florida so that the

12   Florida rate would be theoretically comparable to

13   the rate on a cruise ship.

14        **Q.**    Do you consider the visitors that a

15   cruise ship has on turnover days as well as on all

16   days when it's in port in various countries?

17        **A.**    Given the security requirements, my

18   understanding is that the allowance of visitors on

19   board is very -- is curtailed or contained to a

20   very high degree.

21        **Q.**    So what's the answer to my question?

22   Do you consider them or no?

23        **A.**    They were not considered in James

24   Fox's approach and they are not considered in my

25   approach.



**JEANNIE REPORTING, INC.   (305) 577-1705**

1      **Q.**     I mean, the fact of the matter is,

2    sir, that you can't actually compare apples to

3    apples or oranges to oranges because of the change

4    in people week over week on board the ships as

5    compared to a population in a city.  Isn't that

6    true?

7           **A.**     That is not -

8              MR. BRAIS:

9           **Q.**     Keith Brais.  Form.

10          **A.**     That is not true and that is why I

11   used the Canadian definition, so I can compare

12   apples and apples and that's why I use a rate per

13   100,000 of population so we can compare apples and

14   apples.

15             MR. MASE:

16          **Q.**     Well, using your comparative

17   methodology, a rate per 100,000, what do you look

18   at for getting your rate per 100,000?  Which

19   statistic do you rely on?  Is it FBI crime

20   statistics for the US or Canadian crime statistics

21   or what?

22          **A.**     For the rate per 100,000 on sexual

23   assaults I use the Canadian, basically the

24   equivalent of the Unified Crime Statistics for the

25   US, the comparable data set that's here in Canada.

**JEANNIE REPORTING, INC.   (305) 577-1705**

1          Q.    Let me ask you this.  How does the

2    Canadian number of rapes per 100,000 compare to the

3    US number of rapes per 100,000 across the

4    population spectrum?

5          A.    Because the Unified Crime Statistics

6    don't have a rate per 100,000 for sexual assaults,

7    there's no way to make a reasonable comparison and

8    that's why I use the Canadian statistics.

9          Q.    Well, what I'm asking you though is

10   how do the Canadian -- how does the incidence of

11   sexual assault in Canada compare to the incidence

12   in the US?

13         A.    Because there's -

14         Q.    Is it higher or lower?

15         A.    Well, because there isn't a data set

16   in the US for sexual assault, one cannot compare a

17   rate in Canada for sexual assault against data that

18   isn't for sexual assault.

19         Q.    Well, based upon -

20         A.    That was a mistake that James Fox did,

21   made in his testimony in 2006 before Congress.  He

22   labelled -- he used data that he labelled as sexual

23   assault and only after I testified a year later did

24   he say "oh, I didn't mean sexual assault.  I meant

25   rape, because there is no sexual assault rate in

```
 1        the US."
 2              Q.    Well, when we take a look at what
 3        Canada measures and I gather what you're talking
 4        about is Canada measures sexual assaults, correct?
 5              A.    Exactly.
 6              Q.    And Canada defines sexual assault
 7        differently than the FBI which creates the Uniform
 8        Crime Statistics defines rapes, correct?
 9              A.    The definition of sexual assaults in
10        Canada is different than the definition of rape in
11        the US.  However, Canada does have a -- if I recall
12        correctly, does have a rate also for rape.
13              Q.    Okay.  When you compare Canada's rate
14        for rapes per 100,000 to the US rate for rapes,
15        which one is higher?
16              A.    I don't have that data in front of me
17        right now so I can't answer with any certainty.
18              Q.    Do you have a recollection?
19              A.    I don't want to guess.
20              Q.    What was your conclusion and what did
21        you testify before Congress to with respect to the
22        likelihood of being sexually assaulted on a cruise
23        ship versus on land?
24              A.    Based on the data available to us, and
25        it was data for different periods of time, there's
```

1    different sets of data, but based on the data

2    available to us, one's likelihood of being sexually

3    assaulted on a cruise ship is 50 percent greater

4    than the likelihood of being sexually assaulted on

5    land in Canada.

6           Q.    But you're not able to correlate that

7    to what the likelihood would be of being sexually

8    assaulted in the US?

9           A.    Only because the US doesn't have a

10    rate for sexual assault.

11           Q.    Okay.  But it does have a rate for

12    rape.

13           A.    Right.  They have a -

14           Q.    Did you offer an opinion on the

15    likelihood of being raped on a ship versus being

16    raped on land in Canada?

17           A.    No, I did not.

18           Q.    Are you able to correlate and carry

19    that over and offer an opinion as to the likelihood

20    of being sexually assaulted in Dallas, Texas or in

21    a US metropolitan area versus on a cruise ship?

22           A.    Because they don't have rates for

23    sexual assault to my knowledge, I can't draw

24    conclusions.  I could rerun the data for those

25    cases that are considered specifically rape and

1    would be able to, in theory, do a comparison on

2    that level.

3         **Q.**   But you haven't done that?

4         **A.**   No, I have not.

5         **Q.**   And so as we sit here today, you're

6    not able to offer any opinion as to whether or not

7    an individual's likelihood of being sexually

8    assaulted on board an NCL cruise ship would be

9    greater or less than being sexually assaulted in

10   Dallas, Texas?

11        **A.**   Without -- I can compute the data, if

12   you want to take a break, and I could come back and

13   tell you what the rates are, I think, but at this

14   moment, I'm unable to give you that and I'm not

15   going to guess.

16        **Q.**   I don't want you to guess, but this is

17   your deposition and I'm here to understand what you

18   do and do not know.  So all I really want to know

19   is as we sit here right now for your deposition, do

20   you have an opinion as to whether the plaintiff

21   here had a greater likelihood of being sexually

22   assaulted on board the NCL ship involved versus in

23   Dallas, Texas where she lived?

24             MR. BRAIS:

25        **Q.**   Keith Brais.  Form.  Asked and



**JEANNIE REPORTING, INC.   (305) 577-1705**

```
 1        answered and lack of (unintelligible).

 2            A.    Again, I could hazard a guess, but as

 3        an expert, that isn't what I do.  Had I been asked

 4        in advance of this to come in prepared to compare a

 5        rate of sexual assault which doesn't exist for

 6        Dallas, Texas, to compare a rate that doesn't exist

 7        in a place with a rate that I know, I could have

 8        come in prepared to at least provide some sort of

 9        comparison with the data that does exist.

10            MR. MASE:

11            Q.    Move to strike as non-responsive.  I

12        appreciate your answer.  My next question to you is

13        this:  As we sit here right now, you're not able to

14        express an opinion on that?  Am I correct?

15            MR. BRAIS:

16            Q.    Keith Brais.  Form, same basis.

17            A.    I can't express an opinion because,

18        number one, I haven't been able to do the

19        computations and number two, there is not, to my

20        knowledge, a rate of sexual assault for Dallas,

21        Texas.

22            MR. MASE:

23            Q.    Thank you.  Let me ask you this.  In

24        the bottom of your paragraph seven, there's a

25        discussion about the way in which --  it's really
```

```
 1     sort of engrafted in paragraph seven, the way in

 2     which the Cruise Line Vessel Safety and Security

 3     Act requires cruise lines to report crimes, and you

 4     talk about how they're not really required to

 5     report all crimes, it's only certain crimes, and so

 6     forth.  You recall all that?

 7          A.    Let me -- I've got it here in front of

 8     me.  In the -- okay, what you're referring to is

 9     the last paragraph on that page?  Is that correct?

10          Q.    The last two paragraphs in your

11     numbered paragraph seven of your declaration on

12     page five.

13          A.    Okay.

14          Q.    And then at the end of paragraph

15     seven, you make the statement "the online data"

16     referring to the data that the cruise lines are

17     required to report, the FBI data -

18          A.    Right.

19          Q.    - "misleads the passenger into

20     believing they're much safer than they actually

21     are," right?

22          A.    Precisely.

23          Q.    That's your opinion, correct?

24          A.    Yes, it is.

25          Q.    But I want to be clear, that online
```

1    data is data which the FBI provides and posts to

2    the US Coast Guard website, correct?

3         **A.**   As a social scientist, one has to

4    understand the source of data and the basis of data

5    before you draw any interpretation or conclusions.

6    The data that the FBI puts -- or the data that's

7    put onto the website is only those cases, number

8    one, that the FBI has chosen to open for

9    investigation and then, number two, within that

10   period of time has reached a conclusion and closed

11   the case.

12        That means that any complaint that they

13   choose not to open a file on is not included in

14   that data which is different than the Uniform Crime

15   Statistics which is the number of complaints, not

16   the number of complaints that a police agency

17   decides to open a file on.

18        **Q.**   Move to strike as non-responsive.

19   Where you reference data in the last sentence to

20   paragraph seven, the data to which you refer is the

21   FBI's data that is given to the US Coast Guard

22   website, correct?

23        **A.**   Correct.

24        **Q.**   Okay.  And that's given pursuant to

25   the Cruise Line Vessel Safety and Security Act,

```
1    correct?

2         A.   It's not all data that the FBI

3    receives.  It's only the data that the FBI is

4    reporting and there's a critical difference between

5    that.

6         Q.   Move to strike as non-responsive.  The

7    data that the FBI provides to the Coast Guard is

8    provided pursuant to the Cruise Line Vessel Safety

9    and Security Act, correct?

10        A.   Correct.

11        Q.   And then the Coast Guard makes it

12   available on its website, also pursuant to the same

13   Act, correct?

14        A.   Correct.

15        Q.   So the availability of the data and

16   the compilation of the data by the FBI is all being

17   done pursuant to US law in the form of the Cruise

18   Line Vessel Safety and Security Act, correct?

19             MR. BRAIS:

20        Q.   Keith Brais.  Form.

21        A.   It's pursuant to the Act that was

22   passed.

23             It's not pursuant to the Act that had

24   been initially introduced before -

25             MR. MASE:
```

1        **Q.**    Right, again -

2        **A.**    Yeah.

3        **Q.**    Okay.  I mean, your statement that the

4    data misleads a passenger into believing they're

5    much safer than they actually are, I mean, you just

6    disagree with the way the law requires the data be

7    compiled and posted, correct?

8              MR. BRAIS:

9        **Q.**    Keith Brais.  Form.

10       **A.**    No.  I'm not speaking to the way the

11   law works.  I'm stating that the data being

12   presented, whether it be because of the law or

13   otherwise, misleads and gives an impression of

14   greater safety than exists.  As I mention, the rate

15   of -- the number of incidents reported in a

16   15-month period on the FBI site versus what was

17   turned over in this case in discovery, the rate of

18   incidents on NCL was 23 times higher than that

19   that's on the FBI site.  That's why the FBI site is

20   misleading.

21              MR. MASE:

22       **Q.**    Move to strike as non-responsive.  In

23   your footnote three, you say "it's worth noting the

24   majority of sexual assaults are not reported to the

25   police.  74 percent don't lead to a report.  54% of

1    rapes not reported to police."

2           Where does that data come from?

3           A.    That's coming from two sources.  One

4    is from the Department of Justice Statistics for

5    1992 and 2000 and the data for 2006 to 2010 is data

6    that was published at the website of RAIIN, R-

7    A-I-I-N, the Rape Abuse and Incest National

8    Network, and I can certainly provide you with

9    copies of that material, if you'd like.

10          Q.    Okay.  You say "given a number of

11   factors, it's likely the under reporting of

12   incidents is even greater on a cruise ship,"

13   correct?

14          A.    That is correct.

15          Q.    First of all, let me ask you this.  Do

16   you know what the incidence of under reporting is

17   of sexual assaults at NCL?

18          A.    I can speak to the reasons why I

19   reached the conclusion that the incidents would be

20   under reported and -

21          Q.    I understand that answer, but it's not

22   -- doesn't answer my question.  My question is do

23   you know the incidence of under reporting, perhaps

24   as a percentage, of sexual assaults at NCL?

25               MR. BRAIS:

```
 1              Q.    Professor Klein, if you're in the

 2       middle of a response and you get cut off, you're

 3       entitled to ask if you can finish your answer.

 4              A.    Okay, thank you.

 5              Q.    Mr. Mase ought to let you finish your

 6       answer, just so you know.

 7                    MR. MASE:

 8              Q.    I will let you finish.

 9                    MR. BRAIS:

10              Q.    I don't want anybody cutting anybody

11       off.

12                 That's my only point.

13                    MR. MASE:

14              Q.    I agree.

15              A.    To my knowledge, there is no data on

16       the rate of under reporting on NCL or on any other

17       cruise ship.  However, I can speak, as I have in

18       some of my writing and also publicly, I can speak

19       to the reasons why there's a higher likelihood of

20       under reporting aboard a cruise ship than on land.

21              Q.    As we sit here today, are you able to

22       offer an opinion within reasonable probability as

23       to the percentage or incidence of under reporting

24       on NCL ships of sexual assaults?

25              A.    I would suggest that the rate of under
```

```
 1    reporting is at least the same as has been found in

 2    other studies and I would argue that in fact it's

 3    probably higher than that rate.

 4          Q.   What's the methodology by which you

 5    reach that conclusion?

 6          A.   The first part of my statement or the

 7    second part of my statement?

 8          Q.   Both.

 9          A.   The first part of my statement is

10    based on the fact that we know what the rate of

11    under reporting is based on other statistics off

12    cruise ships and there is no basis in research to

13    conclude that somehow under reporting is going to

14    be lower on a cruise ship.  To the contrary, and

15    this is the second part, I believe there's a number

16    of reasons that we can give for why we would assume

17    that under reporting would be more likely on board

18    a cruise ship.  Most -

19          Q.   But for -- go ahead.

20          A.   Okay.  Most notably, the fact that

21    there's no independent police force.  If I'm

22    sexually assaulted in my home community, I can call

23    the police.  If I'm sexually assaulted on a cruise

24    ship, I can call a cruise ship employee to come and

25    investigate who has a vested interest and I may not
```

1    be willing to trust that a cruise ship employee is

2    going to provide the same care to me as would be

3    provided by my local police.

4         Q.   So those are two assumptions you're

5    making though, correct?

6         A.   Well, two assumptions based on a

7    social scientific kind of insight and a review of

8    social scientific literature.

9         Q.   But as we sit here today, you can't

10   cite me any empirical data, any studies or any peer

11   reviewed materials that would remotely support your

12   assumptions or conclusions, can you?

13              MR. BRAIS:

14         Q.   Keith Brais.  Form.

15         A.   I believe I could cite -- and I would

16   need to search the material out -- I could cite

17   basis for making --  for the claim I'm making that

18   there are disincentives on board a cruise ship for

19   reporting and for that reason, the rate of under

20   reporting would likely be greater than on land, all

21   things being equal.

22              MR. MASE:

23         Q.   But as we sit here today, are you able

24   to say within a rate of reasonable certainty that

25   the rate of under reporting is greater than on

```
 1    land?

 2            A.    To my knowledge -

 3            MR. BRAIS:

 4            Q.    Keith Brais.   Form.

 5            A.    To my knowledge, there is no data in

 6    which to argue either that it is higher or not.   We

 7    would need to undertake research in order to

 8    determine that.

 9            MR. MASE:

10            Q.    Okay.  And to your knowledge, that

11    research has not yet been done, correct?

12            A.    To my knowledge, it has not been.

13            Q.    Okay.  I'm going to take about a one

14    and a half, two minute break, since it's noon time,

15    and then we'll try to wrap you up, okay?

16            A.    Okay.

17                         (OFF RECORD)

18            MR. MASE:

19            Q.    At paragraph number eight, you talk a

20    little bit about drinking on board the ship,

21    correct?

22            A.    That is correct.

23            Q.    Do you have any formal training in

24    alcohol, alcohol consumption, alcohol related

25    policies, that kind of thing?
```

```
 1              A.    No formal training, no.

 2              Q.    Okay.  Have you ever testified as an

 3     expert on intoxication or alcohol consumption?

 4              A.    I did provide a deposition in one case

 5     where I did talk about the issue of the safe

 6     serving of alcohol and the over intoxication of a

 7     person that led to a serious bodily injury as a

 8     result of assault.  That would be actually a case I

 9     believe one of your colleagues was the defendant's

10     attorney on, the Boney versus Carnival Corporation

11     case.

12              Q.    Okay.  But you're not a toxicologist,

13     for example, right?

14              A.    No, I'm not.

15              Q.    And you're not an expert on safe

16     serving alcohol policies like for example Mr.

17     Willingham, correct?

18              A.    No, I am not.

19              Q.    You'd defer to him on such opinions?

20              A.    Yes, I would.

21              Q.    Okay.  Now you mentioned in your

22     report, top of page six, that the pub crawl is the

23     type of event that contributes to a cruise ship's

24     economic bottom line, correct?

25              A.    Correct.
```

1      **Q.**   Do you know what the cost to NCL is of

2    serving the drinks to each passenger on board the

3    pub crawl?

4           **A.**   I believe in the deposition I read it

5    was somewhere around between 15 and 20 percent.

6           **Q.**   15 and 20 percent of what?

7           **A.**   That the cost per drink for the

8    revenue received is about 15 to 20 percent of what

9    is received.  So for a $5 drink, it would cost them

10   between 75 cents and a dollar.

11          **Q.**   Right.  But I'm talking about on the

12   pub crawl itself, do you know what -- people pay

13   $25 for that thing, right?

14          **A.**   Correct.

15          **Q.**   And then NCL's got a couple of

16   employees who go along, correct?

17          **A.**   Yes, but I'm not sure whether the

18   personnel costs are part of the usual computation

19   of their net revenue for onboard revenue.

20          **Q.**   Well, let's do it this way.  Can you

21   tell me what the profit per passenger is from that

22   $25?  What does NCL make off each passenger?

23          **A.**   Based on my understanding of the

24   deposition from the NCL employee, I would conclude

25   that it would be somewhere close to $20.

```
1              Q.    Okay.  That's based on your reading

2      now where?

3              A.    That would be in the deposition given

4      by --

5                   I'm going to have to find the name here.

6              Q.    Mark Cansley (phonetic)?

7              A.    Exactly.

8              Q.    Okay.  So when you're giving that

9      opinion, it's just based on what he said, correct?

10             A.    Yes, I assume that he would be in the

11     know based on his position with the company.

12             Q.    Okay.  Now you also indicate here

13     that, midway down on page six, "36 percent of

14     sexual assaults on cruise ships occur with either

15     one or more individuals being intoxicated,"

16     correct?

17             A.    Yes, and you got to keep in mind the

18     parenthetical statement that in that data we don't

19     know in all cases whether or not -- well, we don't

20     -- in all cases, intoxication, whether it is

21     present or not, is not indicated.

22             Q.    Right.

23             A.    So that 36 percent of all cases, one

24     or both are intoxicated, however I believe it's

25     only about two-thirds of the cases that we know
```

1   whether or not people were either yes or no

2   intoxicated.

3        **Q.**   But on land, the FBI has documented

4   that 50 percent of sexual assaults are associated

5   with alcohol consumption, correct?

6        **A.**   Correct.  Which would suggest that my

7   number, given the caveat in parentheses, is

8   actually probably in line with what the FBI is

9   saying on land.

10        **Q.**   That would be one suggestion.  Another

11   suggestion would be that actually a smaller

12   percentage of sexual assaults on cruise ships

13   involve alcohol.  Wouldn't that be another

14   suggestion?

15        **A.**   It could be a suggestion, but it's not

16   a conclusion that can be drawn from the data.

17        **Q.**   Well, let me ask you this.  The data,

18   so that we're clear, is that 36 percent of sexual

19   assaults on cruise ships occur where one of the

20   individuals is intoxicated.  That's what the data

21   says, right?

22        **A.**   Where one or the other is known to be

23   intoxicated, but the data is incomplete with regard

24   to all cases identifying whether or not a person

25   was intoxicated.

```
1           Q.    But the data for land is incomplete
2     too with regard to all cases indicating whether an
3     individual is intoxicated.
4           A.    I can't speak to that data because I
5     didn't collect it.
6           Q.    But let me ask you this.  Isn't it a
7     fact that the only data available right now says 36
8     percent of sexual assaults has one or more
9     individuals intoxicated, correct?
10          A.    Incorrect, because you cannot take
11    that number in isolation without considering the
12    context that there are a significant proportion of
13    cases where the report provided by the cruise line
14    to the FBI did not indicate the status as to being
15    intoxicated or not.
16          Q.    Sir, you've chosen to cite to the data
17    that the FBI has on cruise ships in your report,
18    correct?
19          A.    That is correct.
20          Q.    And you've chosen to cite to the data
21    that said that at least 36 percent of all sexual
22    assaults on cruise ship occur with either the
23    victim or perpetrator or both known to be
24    intoxicated, correct?
25          A.    I've stated that with the
```

1    parenthetical statement because that data is data

2    that I generated and I know precisely what is in

3    the data and why that 36 percent is a minimum rate

4    and not the maximum rate.

5         **Q.**    So are you telling me then that the

6    data is unreliable?

7         **A.**    No.  I'm telling you that if you

8    wanted a precise answer, I can go back to the data.

9    I can exclude all of those in which we don't know

10   whether the person was intoxicated or not and then

11   I can give you a rate for that percentage of cases

12   where we know whether or not one or both were

13   intoxicated, the number of cases where the person

14   was versus not intoxicated.  You know, that isn't

15   -- I mean, that's what you're asking me for and I'd

16   be more than happy to generate that data.

17        **Q.**    36 percent is what your review of the

18   data revealed is the minimum number of those

19   individuals intoxicated, correct?

20        **A.**    Correct, because we don't know the

21   number who are or are not intoxicated in a sizable

22   proportion of the data.

23        **Q.**    And 50 percent is the number the FBI

24   has come up with for land, correct?

25        **A.**    Correct.

 **JEANNIE REPORTING, INC.  (305) 577-1705**

1      Q.    And the FBI data from cruise ships

2    reveals 34.8 percent of physical assaults are

3    associated with alcohol, right?

4      A.    That would be again my data, not --

5    so it's the FBI data, but it's my analysis of their

6    data and the same caveat would apply because again,

7    we don't know in all cases.  So I didn't put the

8    paragraph -- my parenthetical statement after those

9    two figures, and I guess for consistency, I should

10   have done that.

11     Q.    When the cruise industry claimed in

12   '06 that the risk of sexual assault on a cruise

13   ship is roughly half that on land, were they

14   comparing to US crime statistics?

15     A.    That was the testimony.

16     Q.    Okay.  But they were not comparing to

17   Canadian crime statistics?

18     A.    That is correct.  I should add to

19   that, just for clarity, as I stated earlier in this

20   deposition that the definition used for sexual

21   assault by the expert for the cruise industry, the

22   definition he used for sexual assault was not

23   correct and so he wasn't talking about a rate of

24   sexual assault for the -

25     Q.    Definition who used?

1          **A.**    The industry's expert, James Fox.

2     What he referred to the rate of sexual assault in

3     the US was not the rate of sexual assault in the

4     US.  He's subsequently admitted that that rate is

5     for rape, not for sexual assault.  And probably

6     it's worth also pointing out that subsequent to his

7     testimony, it came out that his data on incidence

8     of sex related offenses on board cruise ships was

9     also incomplete, so that the data he was working on

10    from the cruise industry was incomplete and he was

11    comparing that data to a rate that he called sexual

12    assault that wasn't sexual assault.  So it's a case

13    of, in social science as we call that, garbage in

14    and garbage out.

15          **Q.**    We call it that in other things too.

16    I want to go over your opinions to make sure I've

17    got them all.  All right?

18          **A.**    Okay.

19          **Q.**    First of all, if I understand it, you

20    think there's a false sense of security on board

21    cruise ships, right?

22          **A.**    I believe that passengers are given a

23    false sense of security on cruise ships, yes.

24          **Q.**    And the basis for that has to do with

25    the cruise lines'  marketing and what the cruise

```
1      lines say outwardly and more importantly, what the

2      cruise industry says as a whole, and then also the

3      way in which the FBI and Coast Guardpost their

4      crime statistics, correct?

5             A.    Correct, and that the cruise lines

6      don't choose to adequately inform passengers that a

7      risk exists.

8             Q.    And in terms of your methodology for

9      reaching that conclusion, it's based upon what?

10            Explain your method.

11            A.    Okay.  The method, I used two kinds of

12     method in my research.  As I've already mentioned,

13     I'm trained as a social scientist.  I'm using

14     quantitative data as in the incidence of sexual

15     assault data or other crime data.  I'm using

16     statistical processes, so I enter the data into a

17     spreadsheet or into SPSS, Statistical Package for

18     the Social Sciences.  I allow the statistical

19     package to analyze that data and provide me

20     descriptive statistics, such as percentages, and in

21     this case, I didn't use any inferential statistics

22     because they didn't appear appropriate but if it

23     were appropriate, I also would have used

24     inferential statistics.  The other -

25            Q.    I don't know if I'm -- my question may
```



1    not have been clear.  I only want to know what your

2    method was for reaching the conclusion that the

3    plaintiff here had a false sense of security on

4    board the NCL ship.

5         **A.**   Okay.  It's based on documentary

6    analysis of what is available to a passenger, going

7    on a NCL ship or other ships, but in this case an

8    NCL ship, so what is the documentary -- evaluation

9    of documentary material or evidence with regard to

10   the expectations that a passenger comes to the ship

11   with and an evaluation of materials that are

12   provided to the passenger subsequent to their

13   arrival on the cruise ship.  The method I use is

14   standard in the social sciences, is verifiable and

15   is open to review by any other academic, any other

16   social scientist with regard to reaching similar or

17   different conclusions.

18        **Q.**   And you would agree with me though

19   that if a jury were given that same documentary

20   evidence that you've taken a look at, that you've

21   just referenced here, that they could reach their

22   own conclusion as to whether there was or was not a

23   false sense of security, correct?

24        **A.**   I believe that's the role that juries

25   play.  They would hear from me as one expert and



```
 1    I'm sure that the defendant would have their own

 2    expert and it would be the role of the jury to

 3    assess which of the experts are providing the most

 4    viable or the most useful explanations and they may

 5    choose to go down the middle.

 6          But I have no control over what the jury

 7    would decide.

 8          Q.   Move to strike as non-responsive.  My

 9    question is do you agree with me that a jury, if

10    given all the documentary evidence that you

11    yourself have looked at, were given that same

12    evidence, that they'd be able to reach a conclusion

13    as to whether there was a false sense of security

14    on board the NCL ship?

15          MR. BRAIS:

16          Q.   Keith Brais.  Form.

17          A.   I agree that a jury, based on the

18    information provided to them, will reach their own

19    conclusion.

20          MR. MASE:

21          Q.   Okay.  Statistical prevalence of

22    sexual assaults and rapes on cruise ships and a

23    comparison of same to shore side statistics, what

24    is your opinion on the statistical prevalence on

25    sexual assaults and rapes on NCL ships as compared
```

1    to the same shore side statistics?

2         **A.**   I believe when I did a quick work up

3    when I first received the NCL data, and it's not

4    included in my opinion, I believe that the rate of

5    sexual assault on board NCL ships was comparable to

6    the rate on land.

7         **Q.**   Okay.  And with respect to shipboard

8    security issues, we've talked about those, right?

9         **A.**   I believe so.

10        **Q.**   Okay.  Do you have any opinions on

11   accessibility issues to spaces where passengers

12   expect a reasonable degree of privacy?

13        **A.**   I have an opinion that would be

14   relative to that and that is that I would think

15   that those would be spaces that under the spirit of

16   the Cruise Vessel Security and Safety Act that

17   would be surveilled by CCTV.

18        **Q.**   Okay.  Other than that opinion which

19   we already discussed earlier, do you have any

20   further opinions on that?

21        **A.**   Not at this point, no.

22        **Q.**   Okay.  Have we covered all your

23   opinions here today?

24        **A.**   I believe we've gone through.  Let me

25   just double check here.  I believe the only thing

```
 1     that -- let me just double check.  I think the only

 2     item that we probably didn't discuss in depth was

 3     under paragraph nine, on page seven, number H is

 4     the opinion that the consumption of alcohol

 5     contributes to the problem of sexual assault.  I

 6     think we talked about that, but we didn't talk

 7     about necessarily the motivation or the fact of

 8     encouraging alcohol consumption on board cruise

 9     ships and yeah, I think that's probably one area we

10     didn't get into.

11          Q.   Well, you would agree with me that

12     proprietors of bars encourage alcohol consumption,

13     don't they?

14          A.   People go to a bar to drink.  I don't

15     disagree.  I think the issue, as I point out in my

16     opinion, is that part of the function of the pub

17     crawl is to make people comfortable in the bars,

18     make them comfortable with the people who are

19     working in the bars and I believe increasing the

20     likelihood that they're going to return to those

21     bars.  I don't criticize that.  That's good

22     advertising, good business, but given the fact that

23     we know that incidence of sexual assaults and other

24     crimes are correlated with intoxication, I think

25     the fact of that knowledge should lead the cruise
```

1    line to be more vigilant in protecting those

2    individuals who are drinking, both in terms of not

3    allowing them to be overly intoxicated, but also

4    when they are intoxicated, to provide additional

5    care or protection to help avoid or prevent the

6    kinds of risks they're under.

7         Q.   In formulating and reaching that

8    opinion, what methodology do you employ?

9         A.   Okay.  In terms of the opinion with

10   regard to the motivation or the opinion with regard

11   to providing --  that people become intoxicated and

12   may need additional care?

13        Q.   Let's be clear.  You're not here to

14   testify as to Ms. Gregory's alcohol content,

15   correct?

16        A.   That is correct.

17        Q.   You're not here to offer like a

18   toxicological opinion, she had .010 whatever,

19   correct?

20        A.   Correct.

21        Q.   You're not here to offer opinions on

22   whether or not NCL's alcohol service policies and

23   practices are reasonable or not, correct?

24        A.   Correct.  What I'm speaking to is the

25   business model of the cruise line with regard to

```
 1    how they make their money and what I believe is an

 2    obligation they have to passengers in line with

 3    that business model.

 4         Q.    Let me ask you about that.  Have you

 5    ever been to business school?

 6         A.    No, I have not.

 7         Q.    Do you have a degree in business?

 8         A.    I think your questions are exceedingly

 9    narrow and fail to acknowledge that sociology as a

10    discipline is a synthesis of economics and other

11    social sciences.  So, I have a foundation and a

12    background in my training as a sociologist which

13    gives me a foundation to discuss economic processes

14    and business models in a broad sense.

15         Q.    Have you ever attended a class at a

16    business school?

17         A.    Perhaps as an undergraduate.

18         Q.    You say perhaps.  What was your

19    undergraduate work again?

20         A.    My undergraduate degree was a major in

21    sociology and social work.  I did take courses in

22    economics, I believe both macroeconomics and

23    microeconomics.  My Masters degree in social work

24    is a --  had a concentration in social

25    administration.  In that degree, we were --  we had
```

**JEANNIE REPORTING, INC.   (305) 577-1705**

1    courses in budgeting and planning, as well as in

2    administration of organizations and agencies.

3         Q.    What exactly is the obligation that

4    you think NCL owed based on its business model?

5         A.    My opinion is that if one of your

6    sources of -- one of your significant sources of

7    income is from the sale of alcohol and if one knows

8    that consumption of alcohol is related to sexual

9    assaults and other crimes that there is a

10   reasonable expectation that that company would be

11   more vigilant in attempting to prevent

12   victimization of those people who are their

13   patrons.  It's good business sense.

14        Q.    That's your opinion?

15        A.    Yes, it is.

16        Q.    Can you cite me any data or peer

17   reviewed articles which share that opinion or

18   express that opinion or explain a methodology for

19   reaching that opinion?

20        A.    The basis of the opinion is based on

21   my prior training and on my analysis and evaluation

22   of documents with regard to articles that would

23   verify that.  It is certainly something that I'm

24   more than prepared to search and find articles that

25   support precisely what I'm saying.

1    **Q.** Other than the fields we've talked

2 about today, what other areas do you consider

3 yourself to be an expert in?

4    **A.** I'm not too sure how to answer that.

5 I'd prefer to be asked about areas that you're

6 curious about, rather than me rattling off areas.

7    **Q.** As you formulate the various opinions

8 that you hold in this case, and you've obviously

9 outlined a number of opinions in a number of

10 different areas, what exactly do you do to go and

11 determine those opinions?

12    **A.** Well, the opinions are based on my

13 knowledge of the cruise industry.  I've been doing

14 research on the industry for some 14 years.  It

15 comes from experience on board cruise ships.  I

16 spent about 300 days aboard cruise ships.  It comes

17 from interviews and discussions with probably

18 hundreds, dozens perhaps, probably over a hundred

19 individuals how have worked on cruise ships or who

20 have been in management positions with cruise

21 lines.  It's based on review of documents from the

22 cruise industry, as well as trade publications.

23 It's based on testimony provided to the US

24 Congress, not just my own and not just in the

25 hearings I've been in, but dating back to the 1980s

1     and 1990s.  It's based on review of books that are

2     in print with regard to the cruise industry.  It's

3     based on the --  I have a broad network of

4     colleagues, both with the Cruise Research Society

5     and International Society of Cruise Researchers,

6     which I'm intimately involved with and spend time

7     with other people who are involved as cruise

8     research as their primary area of academic

9     research, as well as my connection and integration

10    with the faculty in programs in tourism, tourism

11    management and specifically in the area of cruise

12    tourism.

13            I'm trying to think.  And part of my

14    being informed was attending the Sea Trade Cruise

15    Shipping Convention for purposes of gathering data.

16    And let's see -- that isn't exhaustive, but I want

17    to avoid being redundant.

18            Q.   Fair enough.  Let me ask you this.

19    Basically what you're saying when you talk about,

20    you know, a business earns significant --  if

21    alcohol sales are a significant source of income,

22    you know that there's -- that alcohol is somehow

23    related arguably to sexual assaults and crime, then

24    you know, you ought to give a --  the passengers

25    have a reasonable expectation of, you know, a

1    cruise line addressing that, that kind of stuff.

2    You're just talking about what you would consider

3    to be responsible and reasonable, correct?

4         **A.**    I think it goes beyond that.

5    Certainly there have been -- there has been

6    research that has talked about the social

7    responsibility of cruise ships and cruise lines and

8    I think this relates to the measures that have been

9    done with regard to social responsibility.

10            Certainly, the literature that's in the

11   area of responsible tourism, this largely comes out

12   of the International Centre for Responsible Tourism

13   at Leeds Metropolitan University, but there is

14   again an international network of more than 100,

15   probably 150 researchers as well as practitioners.

16   I guess I want to be clear that what I'm saying is

17   not drawn out of thin air as my opinion in

18   isolation.  It's informed by the knowledge and data

19   I have about the cruise industry, my knowledge and

20   involvement with professional, academic networks

21   with regard to topics that are relevant to the

22   cruise industry and applying this knowledge and

23   these theories from these different perspectives to

24   understanding not just the way the cruise industry

25   operates but the issues or problems that may be

1   relevant with regard to what they are doing or may

2   not be doing.

3        **Q.**   And if we boil it down and distil it

4   into sort of a simple synthesis, it's about what

5   you consider to be socially responsible and

6   reasonable under the circumstances, correct?

7        **A.**   No.

8            MR. BRAIS:

9        **Q.**   Keith Brais.  Form.

10       **A.**   I don't think it's a matter of what is

11   reasonable because reasonable, as I hear you say,

12   can be synonymous with commonsense and what I'm

13   saying is not based on commonsense.

14           It's based on the theories that underlie

15   responsible tourism, the theories that would

16   underlie let's say business models and motivations

17   for profit.  It goes beyond just, you know, what I

18   want to believe.  It's based on literature.  It's

19   based on research and it's based on dialogue with

20   other academics who are working in the same field.

21           MR. MASE:

22       **Q.**   Okay.  Let me ask you this.  When you

23   were hired by Mr. Brais, what exactly were you

24   hired to do?

25       **A.**   He indicated that he had a case and he

```
1    described the case and he asked me if I would be
2    able to offer an opinion with regard to -- if I
3    recall the conversation correctly, if I would be
4    able to offer an opinion with regard to the risk a
5    passenger has of sexual assault in going on a
6    cruise ship and the nature of -- well, the nature
7    of the risk, as well as either areas of a ship that
8    are more or less likely to be a source of
9    difficulty.  I had forwarded to him, after that
10   conversation, my testimony before Congress and I
11   also forwarded him an article that was published in
12   the Journal of Tourism, Marine Environment, called
13   "Sex and Sea:  Sexual Crimes on Cruise Ships" which
14   was published after the date of this occurrence and
15   for that reason, I wasn't sure if it was relevant
16   to be included in this file, but I'm more than
17   happy to provide you a copy of that article.
18        Q.   I don't have any further questions for
19   you, Mr. Klein.  Thank you so much.
20        A.   Okay, Curtis, thank you.
21             MR. BRAIS:
22        Q.   This is Keith Brais.  I don't have any
23   questions at this time.
24        A.   Okay, great.
25             MR. MASE:
```



**JEANNIE REPORTING, INC.   (305) 577-1705**

1        Q.     I look forward to meeting you in

2   person next time.  I wanted to be able to see you

3   as we talked.  Next time I'll come there.

4        A.     Yeah, that would be real nice.  Take

5   care of yourself.

6        Q.     Thank you.  You guys have a great day.

7   Bye bye.

8        A.     Bye bye.

9           1 (UPON CONCLUSION AT 2:20 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25